**In re M.J.B. & M.W.S., Jr.**

Court of Appeals of Tennessee,
at Nashville.

Feb. 17, 2004 Session.

April 8, 2004.

Permission to Appeal Denied by
Supreme Court July 12, 2004.

Nick Perenich, Nashville, Tennessee, for the appellant, K.D.M.

Paul G. Summers, Attorney General and Reporter, and Elizabeth C. Driver, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Thomas H. Miller, Franklin, Tennessee, Guardian ad Litem for M.J.B. and M.W.S., Jr.

## OPINION

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

This appeal involves the termination of a mother's parental rights with regard to her two children. Approximately two years after removing the children from their mother's custody, the Tennessee Department of Children's Services filed a petition in the Davidson County Juvenile Court to terminate both the mother's and the two fathers' parental rights. The mother contested the petition, but ultimately, the children's fathers did not. Following a bench trial, the court entered an order terminating both the fathers' and the mother's parental rights. The mother has appealed. We have determined that the record contains clear and convincing evidence warranting termination of the mother's parental rights under Tenn.Code Ann. § 36–1–113(g)(2) & (3) (Supp.2003).

### I.

K.D.M. was born in November 1978. She was raised by her mother after her father died when she was 2½ years old.

One or more of her mother's boyfriends abused K.D.M. both physically and sexually when she was a child, and she was briefly placed in a foster home after one of her mother's boyfriends physically abused her. She attempted suicide several times and was hospitalized in a psychiatric facility on at least one occasion during her childhood. She was eventually diagnosed with depression and bipolar disorder.

K.D.M. eventually dropped out of high school in the middle of the eleventh grade. She took up with M.W.S. and, on September 13, 1996, she gave birth to her first son, M.W.S., Jr., in Sumner County. M.W.S. physically abused K.D.M. and on one occasion threatened to kill M.W.S., Jr. if K.D.M. tried to leave him. M.W.S. eventually abandoned K.D.M. and their child, and K.D.M. then took up with B.J.B.

B.J.B. also physically abused K.D.M. On May 23, 1998, K.D.M. gave birth to her second son, M.J.B. B.J.B. was the boy's father. For the next two years, B.J.B. was physically abusive toward K.D.M. and M.W.S., Jr. He also forced K.D.M. to have sex with him in front of both children. In early 2000, B.J.B. was arrested and incarcerated in the Hardin County Jail. K.D.M. was unemployed, and so she was reduced to selling her plasma twice a week to buy food for herself and her children. She was living in a squalid, rundown trailer at the rear of a junk yard. Both M.W.S., Jr. and M.J.B. were malnourished and essentially naked because K.D.M. could not provide them either food or clothes.

On June 29, 2000, K.D.M. brought her children to the Community Services Agency in Nashville seeking financial assistance. The children were hungry, practically naked, and in need of medical attention. K.D.M. requested that the children be placed in custody. On June 30, 2000, the Davidson County Juvenile Court entered an emergency protective custody order placing the children in the custody of the Department of Children's Services. The children were placed together in two foster homes between June 30 and July 6, 2000, and then were placed in a foster home in Cheatham County on July 6, 2000.[1]

The forced loss of her children was a serious psychological blow to K.D.M. On July 18, 2000, she was admitted to the intensive care unit at Tennessee Christian Medical Center after taking an overdose of anti-anxiety medication. During her six-day hospitalization, K.D.M. met R.H. who was also hospitalized in the psychiatric unit at Tennessee Christian Medical Center. R.H. had a history of substance abuse and chronic mental illness. Following her release, K.D.M. took up with R.H. and eventually married him on August 19, 2000.

The Department prepared revised permanency plans for M.W.S., Jr. and M.J.B. on August 29, 2000, reflecting K.D.M.'s recent marriage to R.H.[2] The seemingly inconsistent goals of these plans were either to return the children to K.D.M. or to ready them for adoption. These plans obligated K.D.M. to meet the following requirements by January 2001:(1) obtain stable housing and employment for six consecutive months,[3] (2) follow all recommendations in Tennessee Christian Medical Center's discharge summary, including

---

1. The Department placed the children in the custody of Residential Services, Inc. on July 19, 2000. The record contains no evidence regarding how this choice was made or the nature of Residential Services, Inc.'s operation or the services it provides.

2. One of the many deficiencies in this record is that it does not contain the initial permanency plans for either child.

3. Meeting this goal was, as a practical matter, impossible because only five months re-

the appointments with a psychologist and a therapist, (3) complete parenting classes, (4) complete individual counseling to address her "Battered Women's issues," (5) submit to random drug screens, and (6) pay court ordered child support.[4]

K.D.M. did not begin addressing her remedial obligations in August 2000 because her marriage to R.H. proved to be more abusive than her prior relationships with M.W.S. and B.J.B. Soon after their wedding, R.H. began using crack cocaine heavily. He exhausted his disability income purchasing drugs. He sold off almost all of the couple's possessions to purchase drugs. He even tried to convince K.D.M. to sell her body for sex to obtain more money to purchase drugs, but K.D.M. refused. K.D.M. also began using crack cocaine and marijuana with R.H.

On October 1, 2000, K.D.M. was again admitted to Tennessee Christian Medical Center for three days after taking more than a prescribed dose of Valium. She insisted that R.H. had overreacted and that she was simply trying to get some sleep rather than harming herself. On this occasion, she was diagnosed with a borderline personality disorder.

Later in the month, on October 24, 2000, the Department revised the parenting plans for M.W.S., Jr. and M.J.B. While K.D.M.'s obligations remained essentially the same, these plans moved their completion date back from January 2001 to either March or April 2001.[5] In addition, the plan regarding M.W.S., Jr. revealed that he had been "sexually acting out with himself and others on more than one occasion" and that K.D.M. had revealed that B.J.B. had "exposed the children to inappropriate sexual conduct." The revised plan required the Department and Residential Services, Inc. to make appropriate diagnosis and treatment available to M.W.S., Jr.

On December 18, 2000, the Department moved to amend its original dependent and neglect petition [6] to allege that M.W.S., Jr. was an abused child and that the abuse he suffered was severe.[7] The Department also asserted that K.D.M. was "the perpetrator of such severe abuse." The Department changed its sexual abuse allegations when it filed its "amended petition to adjudicate dependency/neglect and sexual abuse" on March 1, 2001. This time, the Department asserted that both M.W.S., Jr. and M.J.B. were "sexually abused children" and that the perpetrator of the abuse was B.J.B., not K.D.M.[8]

K.D.M. finally left R.H. in February 2001. She lived briefly in a transient motel and then moved into a trailer on Dickerson Road with some friends. She began working as a day laborer in April 2001 where she met J.W.G., a former United

mained between the date of the plan and January 1, 2001.

4. The record contains no indication that K.D.M. was ever ordered to pay child support.

5. K.D.M. objected to the dual goals of the revised plan. In an order entered on October 30, 2000, the juvenile court determined that the goal of reunification was not inconsistent with the goal of placing the children up for adoption.

6. The Department's original dependent and neglect petition is not in the record.

7. The Department did not assert in this motion that M.J.B. had been severely abused.

8. The Department asserted that "the mother of these children has made statements that the children were exposed to sexual activity when she and ... [B.J.B.] had sexual intercourse or were otherwise engaged in sexual activity in front of them. It is unclear whether the mother ... was forced to engage in sexual activity ... in front of the children or whether she was an active participant and a perpetrator of sexual abuse on these children as well."

States Marine who had been discharged from the service after being diagnosed with an antisocial personality disorder.[9] J.W.G. and K.D.M. became friends after J.W.G. performed a magic show for M.J.B.'s birthday.

In mid-June 2001, K.D.M. moved into a trailer park on Murfreesboro Road after moving out of the trailer on Dickerson Road and living briefly in a motel. She also obtained employment at Kroger. J.W.G. also moved into the trailer. K.D.M. and J.W.G. became engaged, but they decided not to rush into marriage. During this interval, K.D.M. received a psychological evaluation at Centerstone Community Mental Health Centers, Inc. and was referred to counseling. She also began receiving homemaker services from Richland Village Home Services Unit. Even though she missed a significant number of appointments with her therapist and homemaker, the Department's quarterly progress report dated November 8, 2001 reported that K.D.M. was "doing a good job right now." [10]

The stability in K.D.M.'s life vanished in November 2001 when both she and J.W.G. lost their jobs. They were forced to move into a cheaper trailer on Dickerson Road, and one month later they moved in with J.W.G.'s mother. On January 16, 2002, the Department prepared yet another revised permanency plan for M.W.S., Jr. and M.J.B. Unlike the earlier plans, the sole goal of this plan was adoption. Despite the fact that the Department no longer anticipated returning the children to K.D.M., the revised plan required her to (1) "utilize the available resources and attend parenting classes to aid herself and the children," (2) address her "Battered Women's issues," and (3) "improve her current situation regarding housing, finances, and employment." Unlike earlier plans, this plan did not require K.D.M. to pay "court ordered child support." [11]

On February 25, 2002, after the children had been in the Department's custody for almost twenty months, the juvenile court held a hearing on the Department's allegations that M.W.S., Jr. and M.J.B. were dependent and neglected.[12] After expressly finding that K.D.M. and her mother were not credible, the court found that K.D.M. had "time and time again" refused services that had been offered to her and her family and that her "constant moving and changing employment indicates to the Court that the mother is not stable." The court also stated that it did not find credible K.D.M.'s testimony that B.J.B. had coerced her to have sex in front of the children.[13] Accordingly, the juvenile court

---

**9.** J.W.G. testified that this disorder manifests itself as extreme nervousness when he is in a crowd.

**10.** According to this report, adoption was no longer one of the Department's goals for either M.W.S., Jr. or M.J.B. The Department's goals were now "return to parent" or "permanent foster care."

**11.** The plan continued to require M.W.S. to pay court ordered child support.

**12.** At the outset of this hearing, K.D.M.'s lawyer requested permission to withdraw from the case. The court denied the motion solely because it would delay the hearing. The court permitted the lawyer to withdraw following the hearing.

**13.** The juvenile court never explicitly found that K.D.M. had abused her children. It's order states:

[K.D.M.] ... did not deny that she and ... [B.J.B.] had sexually [sic] relations in front of the children, and on more than one occasion. [K.D.M.] ... testified that if she did not acquiesce, then he would beat her. The Court does not find [K.D.M.'s] ... explanation credible. [She] ... could have called the police or let others know of [B.J.B.'s] ... actions. Yet, there was no testimony that [K.D.M.] ... reported anything to the police.

concluded that both children were dependent and neglected and that they had been severely abused.[14]

On April 4, 2002, the Department filed a poorly drafted petition to terminate the parental rights of K.D.M., M.W.S., and B.J.B. With regard to K.D.M., the factual allegations in the complaint asserted six separate grounds for terminating her parental rights.[15] These grounds included: (1) Tenn.Code Ann. § 36–1–113(g)(1) [abandonment for failing to make "reasonable efforts to provide a suitable home" for the children],[16] (2) Tenn.Code Ann. § 36–1–113(g)(2) [substantial noncompliance with the requirements of the permanency plan], (3) Tenn.Code Ann. § 36–1–113(g)(3) [failure to remedy persistent conditions], (4) Tenn.Code Ann. § 36–1–113(g)(4) [severe child abuse], (5) Tenn.Code Ann. § 36–1–113(g)(9) [termination of parental rights of persons other than legal parents or guardians],[17] and (6) Tenn.Code Ann. § 36–1–113(g)(8) [mental incapacity]. Inexplicably, the petition's prayer for relief requested termination only on the grounds in Tenn.Code Ann. § 36–1–113(g)(1), (2), (3), and (9). It did not explicitly request termination on the grounds in Tenn.Code Ann. § 36–1–113(g)(4) and (8).

The quarterly progress report prepared by K.D.M.'s case manager on June 28, 2002 concluded that K.D.M.'s life was not "stable." The case manager was concerned about her frequent moves, and her failure to complete her psychological evaluation and to continue with her medications. K.D.M. had also failed to attend parenting classes.

K.D.M. and J.W.G. moved to Centerville in July 2002 after J.W.G. found construction work with his brother. K.D.M. did not work during the five months they lived in Centerville, although she attended the counseling sessions made available to her in Centerville, as well as a program called "Women Are Safe." She also took her prescribed medications more regularly. Following a hearing on August 28, 2002, the trial court filed an order on September 4, 2002 terminating the parental rights of M.W.S. and B.J.B.[18] The trial court also set a new date for trial on the Department's petition to terminate K.D.M.'s parental rights and appointed her another lawyer.

J.W.G. lost his construction job in Centerville in November 2002 after he injured his hand. K.D.M. and J.W.G. returned to Nashville and moved in with J.W.G.'s

14. The juvenile court entered an order embodying its decision on May 1, 2002. K.D.M. did not pursue a de novo appeal to the circuit court pursuant to Tenn.Code Ann. § 37–1–159(a) (2001), most likely because the juvenile court permitted her lawyer to withdraw on March 11, 2002. The court did not appoint K.D.M. another lawyer until September 2002.

15. In addition to the numerous deficiencies that we will later note, the petition erroneously states that the Department's initial petition for custody and emergency removal was filed on June 29, 2000, and that the children's birth certificates were attached as exhibits to the petition. In fact, the Department's petition was filed on June 30, 2000, and the record does not contain copies of the birth certificates.

16. The Department alleged that the children's fathers had willfully failed to support them for four consecutive months immediately preceding the filing of the petition but did not make this allegation against K.D.M.

17. The Department erroneously referenced Tenn.Code Ann. § 36–1–113(g)(8) apparently because the lawyer who drafted the complaint overlooked the 2000 amendment that renumbered the subsections in Tenn.Code Ann. § 36–1–113(g). Act of May 4, 2000, ch. 683, § 1, 2000 Tenn. Pub. Acts 2010.

18. M.W.S. and B.J.B. have not appealed from the termination of their parental rights.

mother and brother. Shortly thereafter, K.D.M. and J.W.G. moved into a motel on Dickerson Road. A progress report dated December 9, 2002 concluded that K.D.M. was still not stable because of her frequent moves, her inability to hold steady employment, and her failure to address her mental health issues. J.W.G. found employment at an auto supply company later in December 2002, and in January 2003, K.D.M. moved into another trailer.

The juvenile court conducted a hearing on February 10 and 13, 2003 regarding the Department's petition to terminate K.D.M.'s parental rights. The children's therapists and case managers explained that both of them had severe problems. M.W.S., Jr. had been diagnosed with post-traumatic stress disorder, reactive attachment disorder, ADHD, and disruptive behavior disorder. M.J.B. also had disruptive behavior disorder and ADHD, as well as a language impairment. Both children were developmentally delayed and required medication in order to function. The witnesses also testified that both children would need continued therapy and medication, a stable, structured home environment, and special schools. They also testified that any adults with whom they lived would need special training.

K.D.M. conceded during her testimony that she had completed approximately one-half of her obligations under the permanency plans. She explained that her domestic problems during her marriage to R.H. had sidetracked her and that her efforts to find stable housing and to hold a job had interfered with her ability to complete the required therapy and counseling. When asked to explain why she had been unable to complete her tasks in two and

one-half years, K.D.M. stated "[j]ust things have come up."

Even though K.D.M. had visited her children regularly after they had been removed from her custody, she testified during the trial that she would not be ready for them to come to live with her for another four to six months, or at least until she completes her obligations under the permanency plan. These obligations include completing her parenting classes, finding steady employment, and arranging for reliable transportation. She also testified that she desired specialized training to enable her to deal more effectively with the special needs of her children.

On March 14, 2003, the court entered an order terminating K.D.M.'s parental rights and placing M.W.S., Jr. and M.J.B. in the Department's custody pending their adoption. The court identified four grounds for its decision: (1) that K.D.M. had abandoned her children by willfully failing to support them,[19] (2) that K.D.M. had failed to comply substantially with the requirements of the permanency plans,[20] (3) that K.D.M. had failed to remedy the persistent conditions that required the children's removal from her custody,[21] and (4) that in a prior court order K.D.M. had been found to have committed severe child abuse.[22] The juvenile court also determined that M.W.S., Jr.'s and M.J.B.'s interests would be best served by terminating K.D.M.'s parental rights.

## II.

### THE APPELLATE RECORD IN TERMINATION CASES

Like many other appeals from decisions to terminate parental rights under Tenn. Code Ann. § 36–1–113, the record in this case contains many extraneous documents

19. Tenn.Code Ann. § 36–1–113(g)(1).

20. Tenn.Code Ann. § 36–1–113(g)(2).

21. Tenn.Code Ann. § 36–1–113(g)(3).

22. Tenn.Code Ann. § 36–1–113(g)(4).

that are not properly includable in the record on appeal. This is apparently due to the notions, particularly entertained by juvenile court clerks, that a termination case is simply a continuation of a dependent-neglect case and that the process for appealing to this court from a final judgment in a termination proceeding is the same as the process used to perfect a de novo appeal to the circuit court in a dependent-neglect case. Both of these notions are mistaken.

 A termination of parental rights proceeding is not simply a continuation of a dependent-neglect proceeding. It is a new and separate proceeding involving different goals and remedies, different evidentiary standards, and different avenues for appeal. The primary purpose of a dependent-neglect proceeding is to provide for the care and protection of children whose parents are unable or unwilling to care for them. The sole purpose of the termination proceeding under Tenn.Code Ann. § 36–1–113 is to sever irrevocably the legal relationship between biological parents and their children.

 Dependent-neglect proceedings are intended to be procedurally "informal," [23] and thus, juvenile courts may receive and rely on "all evidence helpful in determining the questions presented, including oral and written reports ... even though not otherwise competent in the hearing on the petition." [24] Informality is not the hallmark of termination proceedings in light of the constitutional magnitude of the rights at stake. In addition, the rules of evidence in a termination proceeding are much stricter. Except for certain privileges not at issue here, the Tennessee Rules of Evidence and the evidentiary rules in the Tennessee Rules of Juvenile Procedure apply in termination proceedings. [25] Thus, for example, hearsay evidence is not properly admissible in termination proceedings unless it fits within one of the exceptions in Tenn. R. Evid. 803. In addition, the court hearing a termination case may only consider evidence that has been "formally admitted." [26]

Final orders in dependent-neglect cases are immediately appealable; however, the appellate remedies available in these cases differ from appellate remedies in other civil cases. In dependent-neglect cases, the parties dissatisfied with a juvenile court's final decision must appeal to the circuit court. Rather than relying on the juvenile court's record, the circuit court must try the case de novo by hearing all the witnesses again and by rendering an independent decision based on the evidence received in the circuit court proceeding. [27] On the other hand, appeals in termination cases are appealed directly to this court and are governed by the Tennessee Rules of Appellate Procedure. [28]

In appeals from a juvenile court's final dependent-neglect order, Tenn.Code Ann. § 37–1–159(c) requires the juvenile court to forward to the circuit court "the entire record in the case, including the juvenile court's findings and written reports from probation officers, professional court em-

**23.** Tenn.Code Ann. § 37–1–124(a) (2001). Parents are frequently not represented by counsel in dependent-neglect proceedings; however, most parents, including indigent parents, are represented by counsel in termination proceedings.

**24.** Tenn.Code Ann. § 37–1–129(d) (2001). The statute also affords the parties or their lawyers the opportunity to controvert these

reports and to cross-examine the persons preparing them.

**25.** Tenn.Code Ann. § 36–1–113(j).

**26.** Tenn. R. Juv. P. 28(c).

**27.** Tenn.Code Ann. § 37–1–159(a).

**28.** Tenn.Code Ann. §§ 36–1–113(q), 122(b)(1), 124(b) (2001).

ployees or professional consultants." No such provision exists with regard to appeals from final orders in termination cases. Accordingly, the appellate record in an appeal from a final termination order should consist only of (1) the petition to terminate parental rights and all pleadings and other papers subsequently filed with the lower court, (2) a transcript or statement of the evidence of the termination proceedings in the lower court, (3) the original of all exhibits filed in the lower court in the termination proceeding, and (4) any other matter designated by a party and properly includable in the record on appeal. Tenn. R.App. P. 24(a).

These generally applicable limitations in the content of the record on appeal are reflected and amplified in the Tennessee Supreme Court's proposed amendments to the Tennessee Rules of Appellate Procedure designed to expedite appeals in termination of parental rights cases. *See In re Amendments to the Tennessee Rules of Appellate Procedure* (Tenn. Jan. 15, 2004).[29] When it takes effect on July 1, 2004, proposed Tenn. R.App. P. 8A(c) states unequivocally that "[i]n addition to the papers excluded from the record pursuant to Rule 24(a), any portion of a juvenile court file or a child dependency, delinquency or status case that has not been properly admitted into evidence at the termination of parental rights trial shall be excluded from the record."

The appellate record in this case contains all the pleadings filed in the juvenile court regarding the earlier dependent-neglect proceeding as well as scores of unauthenticated documents placed in the juvenile court's file at some time during the dependent-neglect proceeding. While a few of these documents were also formally introduced as exhibits during the trial of the termination petition, most of them were not. In fact, at least two of them were excluded by the juvenile court.[30]

When a record on appeal contains extraneous materials, it becomes difficult to ascertain whether and to what extent the trial court relied on these materials. It also creates a risk that these materials might influence the appellate court's consideration of the case. Separating the evidentiary wheat from the chaff is extremely difficult and time consuming, and impedes the court's efforts to expedite these appeals in accordance with Tenn.Code Ann. § 36–1–124(b). In the future, the contents of the record on appeal in all cases involving the termination of parental rights must comply with this opinion and with proposed Tenn. R.App. P. 8A(c). Rather than delaying the final disposition of this appeal, we have carefully reviewed the contents of the record on appeal and have not considered the materials that were not properly admitted in the proceedings below.

## III.

### THE STANDARDS FOR REVIEWING TERMINATION ORDERS

■ A biological parent's[31] right to the care and custody of his or her child is

---

**29.** 9 West's Tennessee Decisions Ct.R. 6 (Mar. 2, 2004).

**30.** The juvenile court excluded the two CASA reports following a hearsay objection by K.D.M.'s lawyer. The Department has not taken issue with the juvenile court's ruling.

**31.** This right exists notwithstanding the marital status of the child's biological parents where a biological parent has established or

is attempting to establish a relationship with the child. *Lehr v. Robertson*, 463 U.S. 248, 262, 103 S.Ct. 2985, 2993–94, 77 L.Ed.2d 614 (1983); *Jones v. Garrett*, 92 S.W.3d 835, 840 (Tenn.2002); *In re Swanson*, 2 S.W.3d 180, 188 n. 12 (Tenn.1999); *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn.Ct.App.2001). The right also extends to adoptive parents. *Simmons v. Simmons*, 900 S.W.2d 682, 684 (Tenn.1995).

among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions.[32] *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 2059–60, 147 L.Ed.2d 49 (2000); *Hawk v. Hawk,* 855 S.W.2d 573, 578–79 (Tenn.1993); *Ray v. Ray,* 83 S.W.3d at 731. While this right is fundamental and superior to the claims of other persons and the government, it is not absolute. It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope,* 77 S.W.3d 137, 141 (Tenn.2002); *Stokes v. Arnold,* 27 S.W.3d 516, 520 (Tenn.Ct.App.2000); *O'Daniel v. Messier,* 905 S.W.2d 182, 186 (Tenn.Ct.App.1995).

Termination proceedings in Tennessee are governed by statute. Parties who have standing to seek the termination of a biological parent's parental rights must prove two things. First, they must prove the existence of at least one of the statutory grounds for termination.[33] Tenn.Code Ann. § 36–1–113(c)(1); *In re D.L.B.,* 118 S.W.3d 360, 367 (Tenn.2003); *Jones v. Garrett,* 92 S.W.3d at 838. Second, they must prove that terminating the parent's parental rights is in the child's best interests.[34] Tenn.Code Ann. § 36–1–113(c)(2); *In re A.W.,* 114 S.W.3d 541, 545 (Tenn.Ct. App.2003); *In re C.W.W.,* 37 S.W.3d 467, 475–76 (Tenn.Ct.App.2000); *In re M.W.A., Jr.,* 980 S.W.2d 620, 622 (Tenn.Ct.App. 1998).

▆▆ No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever. Tenn.Code Ann. § 36–1–113(*l*)(1); *M.L.B.*

*v. S.L.J.,* 519 U.S. 102, 119, 117 S.Ct. 555, 565, 136 L.Ed.2d 473 (1996); *In re Knott,* 138 Tenn. 349, 355, 197 S.W. 1097, 1098 (1917); *In re D.D.K.,* No. M2003–01016–COA–R3–PT, 2003 WL 23093929, at *8 (Tenn.Ct.App. Dec.30, 2003) (No Tenn. R.App. P. 11 application filed). Because the stakes are so profoundly high, Tenn. Code Ann. § 36–1–113(c)(1) requires persons seeking to terminate a biological parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence. This heightened burden of proof minimizes the risk of erroneous decisions. *In re C.W.W.,* 37 S.W.3d at 474; *In re M.W.A., Jr.,* 980 S.W.2d at 622. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr,* No. M2002–02603–COA–R3–JV, 2003 WL 21946726, at *9 (Tenn.Ct.App. Aug.13, 2003) (No Tenn. R.App. P. 11 application filed), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine,* 79 S.W.3d 539, 546 (Tenn.2002); *In re C.D.B.,* 37 S.W.3d 925, 927 (Tenn.Ct.App. 2000). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.,* 84 S.W.3d 592, 596 (Tenn.Ct. App.2002); *Ray v. Ray,* 83 S.W.3d at 733; *In re C.W.W.,* 37 S.W.3d at 474.

▆▆ Because of the gravity of their consequences, proceedings to terminate parental rights require individualized decision making. *In re Swanson,* 2 S.W.3d at 188. Accordingly, Tenn.Code Ann. § 36–1–113(k) explicitly requires courts terminating parental rights to "enter an order

---

**32.** U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8.

**33.** The statutory grounds for terminating parental rights are found in Tenn.Code Ann. § 36–1–113(g).

**34.** The factors to be considered in a "best interests" analysis are found in Tenn.Code Ann. § 36–1–113(i).

which makes specific findings of fact and conclusions of law" whether they have been requested to do so or not. *In re Adoption of Muir*, No. M2002–02963–COA–R3–CV, 2003 WL 22794524, at *3 (Tenn.Ct.App. Nov.25, 2003) (No Tenn. R.App. P. 11 application filed). These specific findings of fact and conclusions of law facilitate appellate review and promote just and speedy resolution of appeals. When a lower court has failed to comply with Tenn.Code Ann. § 36–1–113(k), the appellate courts must remand the case with directions to prepare the required findings of fact and conclusions of law. *In re D.L.B.*, 118 S.W.3d at 367; *In re K.N.R.*, No. M2003–01301–COA–R3–PT, 2003 WL 22999427, at *5 (Tenn.Ct.App. Dec.23, 2003) (No Tenn. R.App. P. 11 application filed).

■■■ Because of the heightened burden of proof required by Tenn.Code Ann. § 36–1–113(c)(1), we must adapt Tenn. R.App. P. 13(d)'s customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R.App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights. *Jones v. Garrett*, 92 S.W.3d at 838; *In re Valentine*, 79

S.W.3d at 548–49; *In re Adoption of Muir*, 2003 WL 22794524, at *2; *In re Z.J.S.*, No. M2002–02235–COA–R3–JV, 2003 WL 21266854, at *10 (Tenn.Ct.App. June 3, 2003) (No Tenn. R.App. P. 11 application filed); *Ray v. Ray*, 83 S.W.3d at 733; *In re L.S.W.*, No. M2000–01935–COA–R3–JV, 2001 WL 1013079, at *5 (Tenn.Ct.App. Sept.6, 2001), *perm. app. denied* (Tenn. Dec. 27, 2001).[35]

## IV.

### ABANDONMENT FOR WILLFUL FAILURE TO SUPPORT

■■■ The first of four substantive grounds relied upon by the juvenile court to terminate K.D.M.'s parental rights is Tenn.Code Ann. § 36–1–113(g)(1). The court found that K.D.M. had abandoned her two children by willfully failing to make reasonable payments toward their support during the four consecutive months immediately preceding the filing of the Department's petition to terminate her parental rights. Terminating parental rights based on failure to support presupposes (1) that the parent is aware of his or her duty to support, (2) that the parent is able to provide financial support, either through income from private employment or qualification for government benefits, and (3) that the parent has voluntarily and intentionally chosen not to provide financial support without a justifiable excuse. *In re Adoption of Muir*, 2003 WL 22794524, at *5. We have determined that the Department failed to present clear and

---

**35.** These decisions draw a distinction between specific facts and the combined weight of these facts. Tenn. R.App. P. 13(d) requires us to defer to the trial court's specific findings of fact as long as they are supported by a preponderance of the evidence. However, we are the ones who must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual con-

clusion. The Tennessee Supreme Court used this approach in *In re Valentine* when it recognized the difference between the conclusion that a biological parent had not complied substantially with her obligations in a permanency plan and the facts relied upon by the trial court to support this conclusion. *In re Valentine*, 79 S.W.3d at 548–49; *see also Jones v. Garrett*, 92 S.W.3d at 838–39.

convincing evidence that K.D.M.'s failure to support her children financially between December 2001 and April 2002—or at any other relevant time—was willful.

 All parents have a duty to support their children.[36] However, when parents no longer have custody of their children, the nature and extent of their duty may be defined and controlled by external factors other than the parents' ability to support. In these circumstances, the nature and extent of the duty to support may be based on a court order defining the support obligation. When a child has been placed in the Department's custody in a dependent-neglect proceeding, a parent's support obligation may also be defined by the permanency plan for the child.

K.D.M. was apparently aware that she had an obligation to support her children as best she could prior to their removal in June 2000. Even though she had not applied for government benefits, she was attempting to meet her obligation by selling plasma twice a week to raise money to support herself and her children. However, the record contains no indication that K.D.M. was aware that she was still obligated to support her children financially after they were placed in the Department's custody. The permanency plans involving her children required her to support her children financially only if ordered by the court. There is no indication in the record that K.D.M. was ever ordered by a court to pay child support.

The record is likewise lacking clear and convincing evidence that K.D.M. was ever able to support her children financially while they were in the Department's custody. She has no marketable skills and has not been employed since November 2001. Her employment record reflects that she has only been able to hold a series of unskilled, low paying jobs for brief periods of time. There is no proof regarding her

exact earnings from these jobs, but the evidence indicates that they did not provide her with sufficient income to support herself, let alone her children, because she continued to rely on others for financial support.

Finally, the record contains insufficient evidence to warrant a determination that K.D.M. voluntarily and consciously decided not to support her children financially even though she was able to do so. While it is true that in 2000 she failed to seek government benefits that would have benefitted her children, she was not eligible for such benefits during the four months immediately preceding the filing of the Department's petition because by that time, the children had been in the Department's custody for over eighteen months. The record simply lacks any evidence that K.D.M. had any disposable resources that she could have used to support her children.

The Department had the burden of producing clear and convincing evidence that K.D.M. willfully failed to support her children financially. Simply proving that she did not support her children is not sufficient to carry this burden. The Department must also prove that K.D.M. was able to provide support and voluntarily chose not to do so. Because the Department failed to present this sort of evidence, the juvenile court's conclusion that K.D.M. willfully failed to support her children cannot stand. Accordingly, we reverse the portion of the March 14, 2003 order terminating K.D.M.'s parental rights based on Tenn.Code Ann. § 36–1–113(g)(1).

**V.**

**COMMISSION OF SEVERE CHILD ABUSE**

 The juvenile court also based the termination of K.D.M.'s parental rights on

**36.** Tenn.Code Ann. § 34–1–102(a), (b) (2001).

its conclusion that the final order in the dependent-neglect proceeding had concluded that she had committed severe child abuse. While Tenn.Code Ann. § 36–1–113(g)(4) provides that parental rights may be terminated on this ground, we have determined that the Department cannot rely on this ground in this case for two reasons. First, the Department failed to request termination on this ground in its petition. Second, the order upon which the Department relies does not find explicitly that K.D.M. committed severe child abuse.

The Department's petition to terminate K.D.M.'s parental rights recites that "the parents have been found to have committed severe child abuse ... under prior order of the Juvenile Court...." However the prayer for relief in the same petition does not request termination based on Tenn.Code Ann. § 36–1–113(g)(4). Even though the Department's lawyer argued at the beginning of the trial that the Department was seeking to terminate K.D.M.'s parental rights based on Tenn.Code Ann. § 36–1–113(g)(4), K.D.M. and her appointed lawyer did not have adequate pre-trial notice that the Department was pursuing termination on that ground.

Second, the shortcomings in the juvenile court's May 1, 2002 order prevent the Department from using it as a basis to terminate K.D.M.'s parental rights under Tenn. Code Ann. § 36–1–113(g)(4). Without question, the May 1, 2002 order reflects the court's conclusion that the children had been severely abused as well as its disbelief of K.D.M.'s testimony that B.J.B. had forced her to have sexual intercourse in front of the children. However, the trial court never explicitly held that K.D.M. herself had severely abused her children. It simply found that "the children [were] severely abused, pursuant to T.C.A. Section 37–1–102(21)(B)." The juvenile court's use of the passive voice obscures its

conclusion regarding the identity of the abuser or abusers. Therefore, based on the particular language of the May 1, 2002 order, we find that it does not provide a basis for terminating K.D.M.'s parental rights under Tenn.Code Ann. § 36–1–113(g)(4).

## VI.

### SUBSTANTIAL NONCOMPLIANCE WITH THE REQUIREMENTS OF THE PERMANENCY PLANS

 Even though K.D.M. concedes that she failed to complete approximately one-half of her obligations under the children's parenting plans, she insists that the evidence does not support the juvenile court's termination of her parental rights based on Tenn.Code Ann. § 36–1–113(g)(2) because of substantial noncompliance with her obligations under the permanency plans for her two children. We disagree.

 Terminating parental rights based on Tenn.Code Ann. § 36–1–113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn.Code Ann. § 36–1–113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn.Ct.App.2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548–49; *In re Z.J.S.*, 2003 WL 21266854, at *12. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In*

*re Valentine,* 79 S.W.3d at 548; *Department of Children's Servs. v. C.L.,* No. M2001–02729–COA–R3–JV, 2003 WL 22037399, at *18 (Tenn.Ct.App. Aug.29, 2003) (No Tenn. R.App. P. 11 application filed).

The Department was required to remove the children from K.D.M.'s custody because her psychological problems prevented her from providing suitable housing and financial support for her children. The requirements placed on K.D.M. in the various permanency plans have consistently been directed toward remedying these conditions. Requiring K.D.M. to find suitable housing and steady employment, to take her prescribed medications, to attend all her therapy and counseling sessions, and to attend and complete parenting classes are, without question, reasonable and appropriate.

During the time that her children have been in the Department's custody, K.D.M. has been unable to keep a steady job or to obtain stable housing that would be safe and appropriate for small children. She had seven to ten different jobs between July 2000 and November 2001 and has been unemployed since November 2001. Only one of these jobs lasted for more than five months; most of them were of extremely short duration. Similarly, K.D.M. lived in fourteen different places between July 2000 and January 2003. The longest she lived at any one location was approximately five months. This evidence demonstrates clearly and convincingly that K.D.M. has been unable to comply substantially with the reasonable obligation that she obtain stable housing and employment.

K.D.M. has failed to take her medications consistently *without good reason.* She has likewise failed to attend all her individual therapy and group counseling sessions and has failed to begin or complete parenting classes. The fact that other similarly situated patients also miss appointments does not excuse the fact that K.D.M. has failed to comply substantially with these requirements.

Based on our independent review of the record, we have determined that the requirements in the permanency plans involving K.D.M.'s children were reasonable and were related to remedying the conditions that required the removal of the children from K.D.M.'s custody. We have also determined that the record contains clear and convincing evidence that the Department has made reasonable efforts to assist K.D.M. and that K.D.M. has been unable to comply substantially with her obligations under these plans. Accordingly, we affirm the juvenile court's conclusion that the Department has carried its burden of proof for terminating K.D.M.'s parental rights under Tenn.Code Ann. § 36–1–113(g)(2).

## VII.

FAILURE TO REMEDY PERSISTENT CONDITIONS

K.D.M. also asserts that the trial court erred by terminating her parental rights under Tenn.Code Ann. § 36–1–113(g)(3). This statute allows termination of parental rights where a parent has failed to remedy conditions that would, in all reasonable probability, cause the children to be subjected to further neglect should they be returned to her and there is very little likelihood that these conditions will be remedied at an early date. Despite K.D.M.'s sincere belief that she can remedy all the conditions threatening the safety of her children within four to six months, the Department has presented clear and convincing evidence to support termination of her parental rights based on Tenn.Code Ann. § 36–1–113(g)(3).

The Department took custody of K.D.M.'s children in June 2000 because

she was unable to provide them basic necessities such as food, clothing, and suitable shelter. K.D.M.'s ability to provide these things was significantly impaired by her chronic psychological difficulties which impair her ability to keep and hold a job. All the persons who testified about K.D.M.'s prognosis stressed that it would take a great deal of effort over many years for K.D.M. to address her own psychological problems and that until she did, she would be unable to provide her children with the structure they currently require. Sadly, persons with a borderline personality disorder generally lead chaotic, unstable lives.

In addition, K.D.M. candidly conceded that she would be unable to support herself and her children without the financial assistance of her current boyfriend. She has been unemployed since November 2001, and during her testimony at trial, she was unable to produce any concrete evidence of prospects for employment in the near future. Thus, K.D.M. has not been able to demonstrate that she will be able at any time in the foreseeable future to provide not only the financial support that the children need but also the structured living environment that their current condition requires. Accordingly, we affirm the juvenile court's conclusion that the Department has carried its burden of proof for terminating K.D.M.'s parental rights under Tenn.Code Ann. § 36–1–113(g)(3).

## VIII.

### THE BEST INTERESTS OF M.J.B. AND M.W.S., JR.

The record contains clear and convincing evidence that both M.J.B. and M.W.S., Jr. have severe psychological and developmental difficulties. Their condition will require continued medication, counseling and therapy, a structured home environment, and special schooling. Their adult custodians, whether adoptive or foster parents,

will be required to have special training in order to be able to manage these children.

Every one of the children's therapists and case managers agreed that their interests would be best served by terminating K.D.M.'s parental rights so that the Department could move aggressively to find a suitable placement for these children. According to this record, taking these steps quickly is necessary because the children's current foster parents have adopted three other children and will therefore be unable to continue to have custody of M.J.B. and M.W.S., Jr. In light of K.D.M.'s current and reasonably anticipated future inability to parent these children and the pressing need for their permanent placement, we concur with the juvenile court's conclusion that the Department has carried its burden of proof under Tenn.Code Ann. § 36–1–113(c)(2) to show that the interests of both M.J.B. and M.W.S., Jr. will be served best if K.D.M.'s parental rights are terminated.

## IX.

We affirm the portions of the March 14, 2003 order terminating K.D.M.'s parental rights based on Tenn.Code Ann. § 36–1–113(g)(2) & (3) and remand the case to the juvenile court for further proceedings consistent with this opinion. We tax the costs of this appeal to the Department of Children's Services.

WILLIAM B. CAIN, J., concurring.

I concur in the judgment that clear and convincing evidence establishes abundant grounds for the termination of the parental rights of the mother in this case and further establishes that it is in the best interests of the children to terminate her parental rights.

I continue, however, to adhere to my view that a preponderance of the evidence standard on the one hand and a clear and convincing evidence standard on the other

are completely incompatiable with each other both at the trial level and at the appellate level. My views are exhaustively set forth in *Estate of Acuff v. O'Linger*, 56 S.W.3d 527 (Tenn.Ct.App.2001) perm.app.denied (Oct. 1, 2001) and in *In re Z.J.S. and M.J.P.*, No. M2002–02235–COA–R3–JV, 2003 WL 21266854 (Tenn.Ct. App. June 3, 2003) (no ruling of an app. filed) (Cain, Judge, concurring) and in *State v. R.S. and K.S.*, No. M2002–00919–COA–R3–CV, 2003 WL 22098035 (Tenn.Ct. App. Sept. 11, 2003) (Cain, Judge, concurring), along with *In re K.N.R., et al.*, No. M2003–01301–COA–R3–PT, 2003 WL 22999427 (Tenn.Ct.App.2003); *see also Colorado v. New Mexico*, 467 U.S. 310, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984); *Taylor v. Commissioner of Mental Health*, 481 A.2d 139, 153–54 (Me.1984); *Riley Hill General Contractor, Inc. v. Tandy Corp.*, 737 P.2d 595, 604 (Or.1987); *Beeler v. American Trust Co.*, 147 P.2d 583 (Ca. 1944), (Traynor, Justice, dissenting).

In any event, the evidence in this case is overwhelming and the clear and convincing evidence standard set forth in *Estate of Acuff v. O'Linger* is clearly met. I concur in the judgment.