IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 15, 2011

IN RE SHAOLIN P. ET AL.

Appeal from the Juvenile Court for Rutherford County
No. TC1410      Donna Scott Davenport, Judge

No. M2010-02549-COA-R3-PT - Filed May 13, 2011

The juvenile court terminated Father's parental rights on the grounds of abandonment by
willful failure to provide support and substantial noncompliance with the permanency plans.
Because we have concluded that the Department of Children's Services failed to establish,
by clear and convincing evidence, that Father's failure to pay support was willful or that the
Department's efforts to help Father find housing were reasonable, we reverse the juvenile
court's decision.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR.
and RICHARD H. DINKINS, JJ., joined.

Stephen Mills, Nashville, Tennessee, for the appellant, Reginald P.

Robert E. Cooper, Jr., Attorney General and Reporter; Marcie E. Greene, Assistant Attorney
General; for the appellee, State of Tennessee, Department of Children's Services.

OPINION

FACTUAL AND PROCEDURAL BACKGROUND

Brenda A. ("Mother")[1] and Reginald P. ("Father") are the biological parents of
Shaolin P. (born in November 1999) and Melissa A. (born in March 2001). When she was
just an infant, Shaolin began living with Mother's great aunt. In 2001, Father pled guilty to
aggravated sexual battery and rape; he was incarcerated until August 2008. Upon his release

_____

[1]Mother previously surrendered her parental rights and is not involved in this appeal.

from prison, Father was put on the sex offender registry. Under the terms of his probation,[2] he was required to stay away from children under the age of 18 other than his own children.

Melissa, who was living with Mother, was brought into the custody of the Department of Children's Services ("DCS") on July 1, 2009, based upon allegations that she had been sexually abused by Mother's boyfriend. DCS prepared a permanency plan for Melissa on July 23, 2009, with a goal of returning her to her parent(s). Father participated in the plan's preparation. Under the plan, Father was to take the following actions to achieve the desired outcomes:

- Sign a release of information to allow DCS to review a previous psycho-sexual evaluation and speak to Father's treatment providers

- Participate in a psycho-sexual evaluation with a parenting component

- Obtain safe and appropriate housing and provide a copy of the lease agreement to DCS by September 23, 2009

- Develop a budget with help from DCS

- Participate in visitation with Melissa, with DCS assistance to establish a bond with his daughter

- Comply with the terms of his probation

- Abstain from any illegal activities that would result in additional charges

- Have a medication evaluation to address previous bipolar diagnosis and follow all recommendations

Shaolin came into DCS custody in late August 2009 after Mother's great aunt, with whom Shaolin was living, was arrested for burglary, vandalism, and theft over $500. At a meeting with DCS to address a placement for Shaolin, Father acknowledged that he was not in a position to care for Shaolin at that time. On September 18, 2009, DCS developed a permanency plan for Shaolin with a goal of returning her to her parent(s). Father participated in the process. His responsibilities under the permanency plan for Shaolin were the same as under Melissa's permanency plan with the addition of two more actions: (1) follow the recommendations from his parenting assessments, and (2) provide documentation that

_____

[2]Father remained on probation at the time of the termination hearing.

chaperone classes would assist in providing permanency (so that DCS could obtain funding for the classes). Father was to obtain safe and appropriate housing and provide documentation to DCS by October 23, 2009.

New permanency plans were developed for both girls on January 11, 2010, with the added goal of adoption. The plans noted that Father had not yet obtained safe and appropriate housing.

On July 20, 2010, Shaolin and Melissa were found by the juvenile court to be dependent and neglected. The court made the following findings with respect to Father:

> [Father] is unable to provide the necessary residential stability, from his own admission, for his Children; also due to his placement on the sex offender registry this limits what actions [Father] can take in regard to providing for his Children with it being noted that [Father] is on the registry due to his own actions; also there is a lack of bond and/or relationship between [Father] and his Children due to his past incarceration; lastly [Father's] housing is not appropriate under all of the circumstances for his Children.

The children remained in DCS custody under the care of a foster family.

DCS filed a petition for termination of parental rights on April 13, 2010. As to Father, DCS alleged grounds of (1) abandonment by willful failure to contribute to the support of the children pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102 and (2) substantial noncompliance with the permanency plans pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2).

### The hearing

The case was heard on October 19 and 20, 2010. Testimony was heard from employees of DCS and its contractors, as well as the foster mother and Father.

The DCS caseworker since July 30, 2010, Amanda McKinney, opined that Father had violated the rule prohibiting him from having contact with children under the age of 18 except his own children. Her opinion was based largely upon a telephone message she received from Father in which she could hear children in the background.[3]

---

[3]Father only saw his own children during supervised visitation.

Father testified that he was still living in the same apartment that DCS had originally determined to be inappropriate for the children, a determination with which he had previously agreed. He stated that he and his landlord had "talked about [the landlord] letting me have his apartment for $150 more, and I've looked at other places." Father stated that he had not gotten an appropriate apartment for the first five months after the children were taken into custody because his monthly disability benefits had been barely enough to pay his current rent, but then his benefits were increased. In addition, because he was a registered sex offender, he had to follow the rules of the registry and people often did not want to rent to him. Father testified about his efforts to find appropriate housing, including looking in the newspaper and on Craigslist, having a friend drive him around to look for signs, and going to apartment complexes.

Father admitted that he had not provided support for the children since they had been in DCS custody except that he gave each child an allowance of five dollars a week. Father received disability benefits of $674 per month and food stamps of $200 per month.[4] His current rent was $460 a month (including utilities). In the new apartment he hoped to get from his landlord, his rent would be $590 a month. Father had no vehicle and had never gotten a driver's license. He currently lived across the hall from his wife; the two could not live together because she had two children living with her.

Father testified that he had been looking for a job.[5] He had never been employed. According to Father, a computer store had "talked about hiring" him to repair computers, but he had to get the job approved through his probation officer. Father testified that he was physically able to work at the computer store. Father could not remember the name of the store and did not have any documentation of the prospective job or the new lease agreement with his landlord.

Father testified that he had asked DCS for help with paying for a new place to live and was told that he would have to get into the place and pay rent for two months before DCS could help him. His caseworker had told him that she would help him with housing, but the only place she ever asked him about was in the housing projects, and Father said he could not live there. That was the only help Father recalled getting with housing. He denied receiving a list of possible housing.

In his testimony, Father denied having violated the rule against being around children under the age of 18. He admitted associating with a woman who was 18 years old.

---

[4]Father's food stamp allotment had recently been raised from $80 a month to $200 a month.

[5]According to Father, he was allowed to earn about $100 a month with his disability benefits.

-4-

Father stated that his medications had recently been reevaluated and he was able to function better on the new medications. Before that, his bipolar disorder made him paranoid around people.

Christy Bush, an employee of Omni Visions, was the resource coordinator for Shaolin. She and Brandy Word, another Omni Visions employee, supervised Father's visits with Melissa and Shaolin. She described the interactions she observed and expressed concern that the children did not typically respond to Father when he attempted to discipline them. Father would bring dinner and some type of activity to the visits.

Brandy Word with Omni Visions was the next witness. She had been assigned to the case in August of 2010, so she had only supervised three of Father's visits with his two daughters. Ms. Word observed that "the quality of [the visits] was kind of lacking in that the girls didn't seem to be interested unless they were getting something from him . . . . Other than that, they were kind of uninterested." According to Ms. Word, Father would attempt to parent or discipline the children; sometimes they would respond immediately, but if they did not Father "tended to have a hard time redirecting them from the behavior." Ms. Word testified that Melissa had counseling for sexual abuse (which did not have anything to do with Father) and Shaolin had counseling as well. She did not consider the bond between the girls and Father to be a strong one.

The children's foster mother testified that she and her husband wanted to adopt the girls.

Shirley Key, the family service worker for Melissa and Shaolin through July 31, 2010, testified that when the children came into custody, one of the major barriers to their going home with Father was his housing. When asked if she had made additional efforts to help Father find appropriate housing (other than helping with rent after he had been in a place for a month or two), Ms. Key stated that she had called several places and received confirmation that they would not lease to Father because of his sex offender status. According to Ms. Key, when she returned to see Father in September 2009, he informed her that he would be inheriting some money from his grandfather and planned to use that money to purchase a home. He anticipated receiving the inheritance within a couple of months. Ms. Key returned to see Father in December 2009 and they talked about other options, including staying with family members, who could share expenses and help with the children. None of the family members were in a position to help Father at that time. Father never provided Ms. Key with documentation that he had attempted to find housing.

Ms. Key later testified that she had told Father on several occasions that if he could find appropriate housing, DCS would assist him with the first month's rent. Ms. Key

testified that "[p]art of his treatment with the guidance center[6] is case management services, and when I spoke with him in May of this year, he said that Justina from the guidance center was also working with him to help him find housing."

On cross-examination, Ms. Key was asked to be more specific about the information she provided to Father as to community resources regarding housing:

A. Community Helpers in an agency in Murfreesboro. Greenhouse Ministries is another agency that sometimes helps with finances.

Q. Did you just give him those names, or did you arrange for a contact over there?

A. I'm not sure. I know we discussed it several different times. I know I had given him phone numbers of contact places.

Q. Okay. But did you contact these agencies and find out if they were willing to help [Father]?

A. Not Greenhouse or Community Helpers.

Q. Okay. So you don't really know whether they would have been in a position to help him?

A. He told me that Community Helpers had stated that they would help him pay his electricity deposit if he got into a place.

Q. And then did you inquire as to this other place, how they would help him?

A. No.

Q. So from what you were aware of then, that [Father] might have help with an electric bill, but do you know if there was any assistance in helping him get into the place?

A. Not that I'm aware of, and I know Justina with the guidance center was also helping him with that.

---

[6]It appears that the "guidance center" provided Father with his medications and other services, but there was no testimony from anyone at the guidance center.

Q. Now, did you coordinate with Justina?

A. That was part of his services that he receives through the guidance center. That was something that I spoke to him on a monthly basis and encouraged him to schedule that appointment.

Q. My question was did you coordinate with Justina.

A. No.

Q. And is there any reason why you didn't do that?

A. There's no reason for it. She's trained in what she does, and that's her job, is to help.

Q. Do you think it might have been important to understand what she was doing for him?

A. I do understand what she was doing for him.

Q. And how–without talking with her, how were you able to understand?

A. I've worked with her on other cases. I know that her job is assisting clients, linking them with resources in the community. That's her job. She's an adult case manager. So she would help [Father] gain housing, employment, anything he needs to succeed in life.

Q. But that's just your speculation, though, correct?

A. That's what she's explained to me in the past is her job.

Q. Okay. But not as it related to [Father]?

A. No.

Later in her testimony, Ms. Key acknowledged that, because of his diagnosis of bipolar, Father would require a little more hand-holding than someone without a mental health diagnosis. When asked what additional services and assistance she provided to Father, Ms. Key answered that she went to his home to talk to him on several occasions about getting over the hurdles he faced with respect to housing. She further testified that "a lot of it, he–he

receives a lot of services already through counseling in the community and through mental agencies." Ms. Key admitted that she did not coordinate with those community resources.

Ms. Key testified that, earlier in 2010, Father's visitation had been changed from unsupervised to supervised because of concerns that the girls could be exposed to inappropriate activities there. Father had missed his curfew three times and had been associating with an 18-year-old girl, and there were people coming in and out of the home who had just been released from jail.

*Trial court decision*

The trial court entered its decision on December 6, 2010, and ordered that Father's parental rights as to Shaolin and Melissa be terminated on the grounds of (1) abandonment by willful failure to support and (2) substantial noncompliance with the permanency plans. Father appeals from this decision.

STANDARDS FOR TERMINATION OF PARENTAL RIGHTS

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Terminating a person's parental rights "has the legal effect of reducing the parent to the role of a complete stranger." *In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005). Pursuant to Tenn. Code Ann. § 36-1-113(l)(1), "[a]n order terminating parental rights shall have the effect of severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject of the petition to that parent or guardian."

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, 2005 WL 1021618, at *7 (citing Tenn. Code Ann. § 36-1-113(g)). To support the termination of parental rights, petitioners must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). A trial court is only required to find one statutory ground in order to terminate parental rights. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*

In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *Id.* at 654. As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

ANALYSIS

I. Willful failure to support

One of the statutory grounds for termination of parental rights is abandonment. Tenn. Code Ann. § 36-1-113. One of the definitions for abandonment for purposes of terminating parental rights is as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(i). The first ground found by the trial court in this case was the willful failure to support.

For the purposes of this provision, "willfully failed to support" or "willfully failed to make reasonable payments toward the support of the child" means the willful failure to

provide monetary support or provide more than token payments toward the support of the child for a period of four consecutive months. Tenn. Code Ann. § 36-1-102(1)(D). "Token support" refers to support that is insignificant given the parent's means under the circumstances. Tenn. Code Ann. § 36-1-102(1)(B).

Willfulness is an essential element of a determination of abandonment in the context of parental termination. *In re M.L.P.*, 281 S.W.3d 387, 392 (Tenn. 2009); *In re C.T.B.*, No. M2009-00316-COA-R3-PT, 2009 WL 1939826, at *4 (Tenn. Ct. App. July 6, 2009). A person's failure to support a child is willful when that person is "aware of his or her duty of support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing support." *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005) (quoting *In re Adoption of T.A.M.*, No. M2003-02247-COA-R3-PT, 2004 WL 1085228, at *4 (Tenn. Ct. App. May 12, 2004)). A parent who fails to support his or her child(ren) because the parent is financially unable to provide support is not willfully failing to provide support. *O'Daniel v. Messier*, 905 S.W.2d 182, 188-89 (Tenn. Ct. App. 1995).

For purposes of Tenn. Code Ann. § 36-1-102(1)(A)(i), the relevant time period for proof of abandonment is the four months preceding the filing of the petition, in this case the period from December 13, 2009 through April 13, 2010. Father admitted that he had not provided financial support for the children during this period, except for giving them an allowance of five dollars a week.

There is no proof in the record concerning Father's income or ability to work during the relevant time period. It is undisputed that Father was receiving disability benefits. He testified that his disability stems from a hemangioma in his left leg and a bipolar disorder. Father testified that, as of the time of the filing of the termination petition, his disability benefits were barely enough to pay for his apartment; he was getting $447 a month in disability benefits and $80 a month in food stamps. His rent was $460 per month. At the time of the hearing, Father's disability benefits had been increased to $674 a month and his food stamps had been increased to $200 a month. Father testified that he had been looking for employment to supplement his disability benefits. According to Father, he could make up to $100 more a month and still receive disability benefits. He claimed to have found a possible position at a computer store but had not yet received approval from his probation officer.

Based upon the evidence in the record, we must disagree with the trial court's finding, by clear and convincing evidence, that Father "has had the ability to increase his earnings and has intentionally and willfully failed to obtain or even attempt employment which he knew was needed to supplement his disability from December 13, 2009, until the filing of the

petition." As stated above, Father's income at the time of the filing of the petition was not enough to pay his rent. DCS did not put on any proof to establish that, during the four months prior to the filing of the petition, Father was able, despite his disabilities, to earn sufficient money to pay support for the children. In light of Father's tight financial predicament during the relevant time period and the absence of proof in the record of Father's ability to earn more during that time, we cannot agree with the court's conclusion that he "willfully and intentionally failed to financially support his children."

## II. Substantial noncompliance with permanency plans

Pursuant to Tenn. Code Ann. § 36-1-113(g)(2), termination of parental rights may be based upon "substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4."[7] With respect to this termination ground, DCS must generally prove by clear and convincing evidence that "it made reasonable efforts to reunite the family and that these efforts were to no avail."[8] *In re Giorgianna H.*, 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006).

The key deficiency identified by DCS with regard to father's compliance with the permanency plans is his failure to find safe and appropriate housing. Father has acknowledged the need to find safe and appropriate housing for his children and does not dispute the reasonableness of this requirement. He does, however, challenge the reasonableness of DCS's efforts to help him find appropriate housing.

Factors to be considered by courts in determining the reasonableness of DCS's efforts include the following:

> (1) the reasons for separating the parent from his or her children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parent's remedial efforts, and (7) the closeness of the fit between

---

[7]Tenn. Code Ann. § 37-2-403(a)(2) sets out the requirements for permanency plans. Subsection (a)(2)(C) states that substantial noncompliance by the parent with the responsibilities listed in the permanency plan provides grounds for termination of parental rights "if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement."

[8]There are exceptions to the requirement of proving reasonable efforts, but they do not apply in this case. *See In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004).

-11-

the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*Id*. at 519. For purposes of evaluating DCS's efforts at reunification, those services required to resolve the parents' most pressing deficits should receive priority. *See In re Randall B., Jr.*, No. M2006-00055-COA-R3-PT, 2006 WL 2792158, at *8 (Tenn. Ct. App. Sept. 28, 2006); *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *14-15 (Tenn. Ct. App. June 30, 2005).

While arguing in its brief that Father failed to substantially comply with the requirements of the permanency plans and that the plans' requirements were reasonable, DCS does not address the reasonableness of its own efforts to assist Father. With regard to Father's most pressing need, safe and appropriate housing, we do not find clear and convincing evidence that DCS made reasonable efforts. Ms. Key testified that she had talked to Father on several occasions regarding his efforts to find housing and had suggested a few organizations for him to call. She did not know whether these organizations could, in fact, help Father find housing. For the most part, Ms. Key deferred to efforts purportedly made by Justina at the guidance center, but acknowledged that she had not talked with the guidance center about housing services for Father. DCS presented no testimony from anyone at the guidance center to establish the housing services that may have been provided by that organization.

This court has previously stated that DCS "must do more than simply provide the parents with a list of services and send them on their way." *In re Giorgianna H.*, 205 S.W.3d at 519. The burden is on DCS to prove, by clear and convincing evidence, that it made reasonable efforts. In this case, involving a parent with mental impairments who is on the sex offender registry, the services documented by DCS hardly amount to reasonable efforts. Standing aside and assuming other agencies are assisting the parent is neither reasonable nor an effort.

CONCLUSION

For all of these reasons, we reverse the decision of the juvenile court terminating Father's parental rights. Costs of appeal are assessed against DCS.

_____
ANDY D. BENNETT, JUDGE