IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned On Briefs July 28, 2011

**IN RE: TIPHANI H.**

**Direct Appeal from the Juvenile Court for Hamilton County**
**No. 237,078      Suzanne Bailey, Judge**

**No. E2010-02112-COA-R3-PT-FILED-OCTOBER 6, 2011**

This is a parental termination case. The juvenile court terminated the parental rights of mother and father on the grounds of persistence of the conditions that required the child's removal and substantial noncompliance with the terms of the permanency plans. Both parents appealed. The mother and father argue the Department of Children's Services did not clearly and convincingly prove grounds for termination of parental rights and did not clearly and convincingly prove termination of parental rights was in the best interests of the child. The mother also argues the trial court erred in determining she waived her right to appear at the termination hearing. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Rachel M. Stephens, Hixson, Tennessee, for the appellant, Mercedes T.N.

Cara C. Welsh, Chattanooga, Tennessee, for the appellant, Terry E.H.

Robert E. Cooper, Jr., Attorney General and Reporter, and Alexander S. Rieger, Assistant Attorney General, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I. Background and Procedural History**

On October 21, 2008, Mercedes T.N. ("Mother") gave birth to Tiphani M.H. ("Tiphani"). Terry N.H. ("Father") is Tiphani's father. While Mother and Father never

married, they have been in a relationship for most of Tiphani's life.

Mother is a young woman with a history of severe mental illness. While pregnant, Mother was hospitalized on two occasions for psychotic behavior and diagnosed with schizophrenia, paranoid type. In November 2008, Mother was hospitalized for attempting to commit suicide by ingesting all of her prescribed medication. Following her release from the hospital, the Department of Children's Services ("DCS") conducted a home interview with Mother. During the interview, Mother told DCS case manager, Wynona McClendon ("Ms. McClendon"), that "her mind wasn't right, and that she had thoughts about giving the baby away."[1] A few days later, Mother was hospitalized again after she ransacked the house, threw down a television, and flooded Tiphani's crib, diapers, and clothing with water. DCS worker, Jacqueline Tucker ("Ms. Tucker"), testified there were allegations Mother would shake Tiphani. When asked about this, Mother replied that "she did not shake the baby hard." While Mother was hospitalized, Tiphani was left in the physical custody of the maternal grandmother. Doctors further diagnosed Mother with possible post-partum depression, and expressed strong concerns about Mother's parenting skills and Tiphani's safety.

DCS created a safety plan with Mother, Father, Mother's aunt, and both grandmothers. The safety plan required Tiphani to not be left alone with Mother at any time. Shortly after, it was discovered Tiphani had been left alone with Mother. On December 18, 2008, the juvenile court placed Tiphani in the temporary legal custody of DCS because of serious concerns about Tiphani's safety and Mother's mental health issues. Tiphani was placed in foster care and a guardian ad litem was appointed. On March 31, 2009, the juvenile court concluded clear and convincing evidence supported a finding that Tiphani was dependent and neglected.

After Tiphani's removal, DCS developed the first set of permanency plans for Mother and Father.[2] The desired outcomes of the plan included Tiphani living in a safe and stable home environment, and Mother attaining adequate mental health to appropriately parent Tiphani. The plan requirements for Mother centered around her mental health issues. The plan requirements for Father focused on his past drug use, inconsistent employment, and unstable living conditions. DCS offered Mother and Father extensive services designed to

---

[1]Ms. McClendon also notes Mother grabbed an open baby bottle of milk and drank it. When asked why she did this, Mother stated she was thirsty and seemed confused.

[2]The permanency plan was revised twice. These revisions, however, are basically identical to the original plan and contain similar requirements. Thus, we will limit our discussion to the original permanency plan.

address the requirements under the permanency plan including arranging parenting assessment, visitation with Tiphani, parenting instruction, and counseling. Further, DCS provided drug treatment for Father and mental health services for Mother.

The record shows Mother and Father did not avail themselves of all the services provided by DCS. Ms. Tucker testified Father attended his initial counseling session, but cancelled all subsequent appointments. Ms. Tucker provided Father with lists and applications for potential employment and housing opportunities. Ms. Tucker even scheduled appointments to help Father fill them out, but Father never submitted the housing applications. While Father did take part in an alcohol and drug treatment program, he failed to attend individual support group sessions recommended to him. When Ms. Tucker attempted to administer a drug test during one of Father's visits with Tiphani, Father became angry and stormed out of the office. Similarly, DCS arranged for Father to attend a "Boot Camp for Dads" meant to improve Father's parenting skills. After attending the program, Father received a basket of baby supplies such as diapers and baby wipes to care for Tiphani. Father later sold the items.

Mother struggled to comply with the requirements of the permanency plan. Just days after the plan was established, Mother attempted to commit suicide by ingesting bleach. Mother was hospitalized and treated for her psychosis and suicidal ideations. Mother admitted she experienced auditory hallucinations, said God was speaking to her, and believed cartoons on television were real and she attempted to talk to them. Ms. Tucker testified that during counseling and visitation sessions, Mother did not comprehend what was required to take care of Tiphani. DCS workers had to prompt Mother to do basic tasks such as changing a diaper, and Mother attempted to leave a session while Tiphani was left alone on the floor crying. Although DCS provided Mother with a parent educator, Mother did not complete any of the assignments given to her. Instead of discussing Tiphani with counselors, Mother would ask why DCS did not want her and Father to be together. Further, Mother admitted she was not telling her psychiatrist she was still hearing voices because she feared she would not be reunited with Tiphani.

Neither Mother nor Father maintained a safe and stable residence after Tiphani's removal. Mother lived with her mother, then with her aunt for one month, and then moved in with Father, Father's brother, his brother's girlfriend, their child, and Father's mother in a two bedroom apartment. After moving back in with her mother, Mother was homeless for almost one month before moving into an apartment she paid for with her monthly disability check. Similarly, Father admitted since Tiphani's removal he lived with his brother for four months, his aunt for two months, with Mother in her apartment for six months, and again with his aunt for two months. Further, Father was unable to maintain steady employment, obtaining only seasonal jobs for a few months at a time.

The time spent during visitation with Tiphani further illustrates Mother and Father's difficulties complying with the permanency plans. Mother often seemed more concerned with spending time with Father during visitations than bonding with Tiphani. On one occasion, Ms. Tucker testified that Father chose to wander the halls and flirt with DCS workers instead of visiting with Tiphani. Finally, Ms. Tucker altered the visitation schedule so that each parent separately visited Tiphani. Father's visitations were arranged to take place in a confined room to prevent distraction.

The juvenile court held a permanency hearing on January 13, 2010. Although the juvenile court stated in its order that Mother and Father were currently in substantial compliance with the permanency plans, the court expressed great concerns with the current state of affairs including Mother's testimony that she does not tell her psychiatrist she is still hearing voices; Mother and Father moved in an apartment together in November 2009, paying rent with Mother's monthly disability check; and Father's statements that he has to keep Mother's medication in a lockbox for her own protection because of her past suicide attempts. Finding that the need for foster care still existed, the juvenile court concluded "progress toward resolving the reasons the child is in foster care has been made, but the Court has grave concerns about the safety of the child if she were to be reunified with either parent at this time. The Court does not believe that the child would be safe in the parents' home and does not recommend reunification at this time."

On March 31, 2010, DCS filed a petition in the Juvenile Court of Hamilton County to terminate the parental rights of both Mother and Father. As grounds for termination, the petition alleged persistence of the conditions that required the child's removal, substantial noncompliance with the terms of the permanency plans, Mother's mental incompetence, and Father's willful failure to support.

Soon thereafter, on May 22, 2010, Mother was arrested and charged with aggravated assault and domestic violence. Officer Victor Miller ("Officer Miller") of the Chattanooga Police Department testified that upon arriving to the scene, he observed Mother on the front porch with a steak knife in her hand and Father with visible injuries on his face, neck, and arms. Father referred to the incident as a misunderstanding and did not wish to press charges against Mother. On the way to the Hamilton County Jail, Mother told Officer Miller multiple times that she planned to kill Father and Tiphani once she got custody of her. Officer Miller immediately informed DCS of Mother's statements about killing Tiphani. On June 10, 2010, following a motion by the guardian ad litem, the juvenile court temporarily suspended Mother's visitation.

The juvenile court conducted a hearing on the termination of Mother and Father's parental rights on August 9 and August 13, 2010. Mother did not appear at the hearing on

the first day. Later it was discovered that Mother was incarcerated, and she was transported to court for the second day of the hearing. Mother did not want to appear at the hearing, however, and was transported back to the corrections facility. The hearing continued in her absence. The juvenile court took the matter under advisement, and on September 16, 2010, entered a final order terminating the parental rights of Mother and Father. The court found DCS clearly and convincingly established the grounds for termination of persistence of conditions and substantial noncompliance, and DCS clearly and convincingly showed termination of Mother and Father's parental rights was in the best interests of Tiphani.

On September 22, 2010, Mother filed a motion to amend the language of the final termination order. In the motion, Mother argued that the language of the final order failed to properly reflect what took place at the termination hearing regarding Mother's decision not to appear while incarcerated. The juvenile court held a hearing on the motion on October 13, 2010. On December 1, 2010, the court entered an amended final termination order. Mother and Father each timely filed a notice of appeal.

## II. Issues Presented

Mother and Father present the following issues, as we perceive them, for our review:

(1)     Whether the trial court erred by finding Mother waived her right to appear and participate in the parental termination hearing,

(2)     Whether DCS clearly and convincingly proved grounds for termination of Mother and Father's parental rights, and

(3)     Whether DCS clearly and convincingly proved that termination of Mother and Father's parental rights was in Tiphani's best interests.

## III. Standard of Review

This Court reviews a trial court's findings of fact *de novo* upon the record, according a presumption of correctness to the findings unless a preponderance of the evidence is to the contrary. Tenn. R. App. P. 13(d); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citation omitted). This Court will not reevaluate the determinations of a trial court based on an assessment of credibility unless clear and convincing evidence is to the contrary. *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005) (citation omitted). This Court reviews the record *de novo* where the trial court has not made a specific finding of fact. *In re Valentine*, 79 S.W.3d at 546 (citation omitted). No presumption of correctness attaches to a trial court's conclusions of law. Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913,

916 (Tenn. 2000) (citation omitted).

Tennessee Code Annotated section 36-1-113 governs the termination of parental rights. The Code provides, in pertinent part:

> (c) Termination of parental or guardianship rights must be based upon:
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c)(1), (2) (2010). This two-step analysis requires appellate courts to consider "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). "Although the 'clear and convincing evidence' standard is more exacting than the 'preponderance of the evidence' standard, it does not require the certainty demanded by the 'beyond a reasonable doubt' standard." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007) (citation omitted). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *Id.* (citation omitted).

## IV. Analysis

We begin our analysis by noting that both Mother and Father assert they each lacked sufficient notice of various hearings that took place during the termination proceedings below.[3] After considerable review of the record, we find that these issues were not raised by Mother or Father at trial.[4] It is well established that issues not raised at trial will not be

---

[3] Mother claims insufficient notice under Tennessee Code Annotated section 36-1-113(f) because of her incarceration at the time of the August hearings. Father claims insufficient notice of the October hearings that took place regarding Mother's motion to amend the language of the final termination order.

[4] Although Mother did not contest notice at trial, the final termination order states that Mother "had been properly noticed of the hearing," and all parties, including Mother's counsel, agreed and informed the court that Mother was aware of the hearing date. Additionally, the record indicates that on September 29, 2010, counsel for Father was present when the court continued the hearing to the subsequent October dates. Notice to Father's counsel suffices as notice to Father. *Moody v. Moody*, 681 S.W.2d 545, 546 (Tenn. 1984) ("Counsel's knowledge must be attributed to his client, if the actions of the court are to have any efficacy.");
(continued...)

considered for the first time on appeal. *See Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983). "The jurisdiction of this court is appellate only and we consider those issues which are timely brought to the attention of the trial court." *Mallicoat v. Poynter*, 722 S.W.2d 681, 682 (Tenn. Ct. App. 1986). Furthermore, Tennessee Rule of Appellate Procedure 36 provides that an appellate court need not grant relief "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a); *see also Alexander v. Armentrout*, 24 S.W.3d 267, 273 n. 9 (Tenn. 2000). As issues not raised at trial are deemed waived on appeal, we will not consider these issues here.[5]

### A. Waiver of Appearance

Mother first argues that the trial court erred when it determined she waived her right to appear and participate in the termination hearing while she was incarcerated.[6] Mother contends that, pursuant to Tennessee Code Annotated section 36-1-113(f)(5), an incarcerated parent can only waive the right to appear and participate in a parental termination hearing by signing a written waiver. Tennessee Code Annotated section 36-1-113(f) provides:

> Before terminating the rights of any parent or guardian who is incarcerated or who was incarcerated at the time of an action or proceeding is initiated, it must be affirmatively shown to the court that such incarcerated parent or guardian received actual notice of the following:
>
>     . . . .
>
>     (3) That the incarcerated parent or guardian has the right to participate in the hearing and contest the allegation that the rights of the incarcerated parent or guardian should be terminated, and, at the discretion of the court, such participation may be achieved through personal appearance, teleconference, telecommunication or other means deemed by the court to be

---

[4](...continued)
*see also Winstead v. First Tennessee Bank, N.A., Memphis*, 709 S.W.2d 627, 632 (Tenn. Ct. App. 1986).

[5]Similarly, we decline to address Mother and Father's argument that the trial court erred by considering events that occurred after DCS filed its petition. Mother and Father fail to cite any authority in support of their arguments. Likewise, we are not aware of any such authority that could give merit to this claim.

[6]While the record is ambiguous as to whether Mother actually raised this issue at trial, we will address it here. Mother's motion to amend the language of the final order regarding her waiver of appearance suggests that counsel for Mother disagreed with the trial court's finding and intended to preserve the issue for appeal.

appropriate under the circumstances;

. . . .

(5) If, by means of a signed waiver, the court determines that the incarcerated parent or guardian has voluntarily waived the right to participate in the hearing and contest the allegation, or if such parent or guardian takes no action after receiving notice of such rights, the court may proceed with such action without the parent's or guardian's participation.

Tenn. Code Ann. § 36-1-113(f)(5) (2010). We note throughout the record that both Mother and the trial court use the words "participate" and "appear" interchangeably.[7] To clarify, an incarcerated parent has the right to "participate" in a termination hearing. An incarcerated parent does not, however, have an absolute right to "appear" at a termination hearing.

In *In re Perry*, No. W2000-00209-COA-R3-CV, 2001 WL 277988, at *5 (Tenn. Ct. App. Mar. 12, 2001), this Court examined the right of an incarcerated parent to physically appear at a termination hearing in which he was a defendant. After reviewing the holdings of previous panels of this Court, we determined that "due process requires the trial court to provide the prisoner defendant with *meaningful* access to the court and an opportunity to be heard." *Id.* Incarcerated parents, however, "have no absolute right to be in attendance at the hearing of a civil matter." *Id.* (quoting *State v. Moss*, No. 01A01-9708-JV-00424, 1998 WL 122716, at *5 (Tenn. Ct. App. Mar. 20, 1998)). "[T]he decision to permit a prisoner to physically appear in court to defend a civil proceeding is within the sound discretion of the trial court." *Id.* (citing *Moss*, 1998 WL 122716, at *4). In exercising this discretion, the trial court should consider:

the costs and inconvenience of transporting a prisoner from his place of incarceration to the courtroom, any potential danger or security risk which the presence of a particular inmate would pose to the court, the substantiality of the matter at issue, the need for an early determination of the matter, the possibility of delaying trial until the prisoner is released, the probability of success on the merits, the integrity of the correctional system, and the interests of the inmate in presenting his testimony in person rather than by deposition.

*Id.* at *6 (quoting *Stone v. Morris*, 546 F.2d 730, 735-36 (7th Cir. 1976)).

---

[7]While the final termination order states that Mother decided "not to participate in the termination hearing," the transcript from the hearing reveals that the trial court found that Mother was waiving her "appearance." After Mother waived her appearance, the trial court permitted counsel for Mother to "participate" and contest the petition on Mother's behalf for the remainder of the termination hearing.

Mother did not appear for the first day of the termination hearing on August 9, 2010. Counsel for Mother assured the trial court that Mother was aware of the hearing date and offered no valid explanation for her absence. On August 13, 2010, the second day of the hearing, counsel for Mother informed the trial court that Mother was incarcerated and was transported from the corrections facility for the remainder of the hearing. The transcript indicates, however, that before the hearing proceeded, counsel for Mother requested that Mother be excused from the hearing:

> COUNSEL: [She] was very clear to me that if this hearing had nothing to do with being released, she wanted to go back to Silverdale, she did not want to be here.
>         . . . .
>         But I really do feel as though, being that she expressed to me that she does want to go back to Silverdale, and just her overall demeanor, she's really in no condition to be in a courtroom right now. I don't think she'd last more than a minute or two without Your Honor having to send her out and possibly make a contempt finding, and I would hate that for her.
>
> THE COURT: Were you able to communicate effectively with her to know that she understood this was the termination proceeding?
>
> COUNSEL: I believe so. She's known about this for quite a while. Like I said, I've been working with her since December '08. We have been talking about the whole permanency process and her plan and working her plan and what the consequences were, and she does understand what's going on, and she has expressed to me she wants me to defend this petition which I plan to do.
>
> THE COURT: But she does not wish to appear?
>
> COUNSEL: She does not. I have no intention of calling her as a witness. And from what I understand, the State was not planning on calling her as a witness.

Based on representations of counsel, the trial court accepted Mother's waiver of appearance.

Our review of the record indicates that the trial court provided Mother meaningful access to the court and an opportunity to be heard. Although Mother was transported from the corrections facility to the courthouse, Mother made clear that she did not wish to take part in the hearing. Even after the trial court allowed Mother the opportunity to confer with counsel, Mother made an informed and voluntary decision not to appear. While we

understand that "[n]o civil action carries with it graver consequences than a petition to sever family ties indelibly and forever," *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *4 (Tenn. Ct. App. Mar. 9, 2004) (*no perm. app. filed*), Mother cites no specific error that resulted from conducting the hearing in her absence.[8]  In fact, neither counsel for Mother nor DCS planned on calling Mother as a witness during the hearing.  Thus, the trial court did not abuse its discretion in finding that Mother waived her appearance.  We affirm the trial court's decision on this issue.

## B.  Grounds for Termination

The next question before this Court is whether DCS clearly and convincingly proved grounds for termination.  This Court will affirm a trial court's finding of grounds if DCS clearly and convincingly proved at least one of the statutory bases for termination.  *State, Dep't of Children's Servs. v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008) (citation omitted).  The grounds before this Court are substantial noncompliance with the permanency plans, *see* Tenn. Code Ann. § 36-1-113(g)(2) (2010), and persistence of the conditions that required the child's removal, *see* Tenn. Code Ann. § 36-1-113(g)(3) (2010).

### i.  Persistence of Conditions

Mother and Father argue that DCS did not clearly and convincingly prove the ground of persistence of conditions.  Tennessee Code Annotated section 36-1-113(g)(3) establishes a ground for termination if:

> (3)  The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A)  The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (B)  There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (C)  The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

---

[8]Although counsel for Mother requested a continuance, when asked whether Mother's appearance would provide anything by way of defense of the petition, counsel for Mother replied "I don't believe so."

Tenn. Code Ann. § 36-1-113(g)(3)(A)-(C) (2010). A finding of persistence of conditions is permissible only if DCS presents clear and convincing evidence to establish each statutory element. *In re Giorgianna H.*, 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006) (citation omitted).

The conditions that required Tiphani's removal from Mother and Father included the serious threat of harm Mother posed to Tiphani due to her serious mental health issues, Mother's inability to care for Tiphani, Father's refusal or inability to protect Tiphani from Mother, and Father's failure to maintain a safe and suitable home for Tiphani. The trial court found clear and convincing evidence to show these conditions persisted at the time of the termination hearing. Further, the trial court found there was little likelihood these conditions would be remedied at an early date so Tiphani could be safely returned to Mother and Father. Moreover, the trial court found that continuation of the parent-child relationship greatly diminished Tiphani's chances of early integration into a safe, stable, and permanent home.

Mother and Father contend the trial court erred in finding that Mother's mental health issues were a persistent condition because DCS presented no expert testimony regarding Mother's mental health. Although DCS did not present expert testimony for the trial court's consideration, the record contains extensive documentation detailing Mother's history of mental illness and hospitalizations. In fact, the trial court ordered disclosure of all Mother's mental health information recorded after Tiphani's removal on December 18, 2008. The court ordered documentation included diagnostic services, records of office visits, treatment notes, psychological assessments, and medication records. Moreover, the transcripts from the hearings provide multiple witness accounts of Mother's mental condition and behavior. Therefore, we find Mother and Father's argument lacks merit.[9]

The termination of parental rights on the ground of persistence of conditions is intended "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010) (citations omitted). After reviewing the record, we agree with the trial court's determination that DCS clearly and convincingly proved the ground of persistence of conditions.

Despite the efforts of DCS and multiple hospitalizations, Mother has been unable to adequately control her mental illness to safely care for Tiphani. Mother attempted to commit suicide just days after Tiphani's removal. Shortly after DCS filed its termination petition,

---

[9]Father also argues that the trial court erred in considering Mother's mental health when terminating his parental rights on the ground of substantial noncompliance because DCS offered no expert testimony on the issue. For the abovementioned reasons, we refuse to address this argument.

Mother was arrested for aggravated assault and domestic violence. Officer Miller testified Mother threatened to kill Tiphani and Father. Further, Mother was incarcerated at the time of the termination hearing and counsel for Mother offered no evidence of her projected release date. The record clearly establishes that Mother is unable to care for Tiphani. "Where, as here, efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *In re Arteria H.*, 326 S.W.3d at 177 (citations omitted). Mother poses the same threat of harm to Tiphani today as she did when Tiphani was placed in foster care. Therefore, we affirm the finding of the trial court terminating Mother's parental rights on the ground of persistence of conditions.

Father fails to comprehend what is required to protect and provide for Tiphani's safety and well being. Father testified he knew of Mother's mental health issues, that she was violent and dangerous, she heard voices, and that he had to keep Mother's medication in a lockbox to prevent her from abusing it or attempting suicide. Although Mother was arrested for assaulting Father and threatening him with a knife, Father referred to it as a misunderstanding and admitted that Mother attacks him every few months. Shortly thereafter, Father requested that the restraining order against Mother be lifted and he moved in with her. Additionally, Father testified that his most stable living arrangement in the two years before the termination hearing was when he lived with Mother in her apartment, paying rent with Mother's monthly disability check. Despite the efforts of DCS to assist Father in obtaining a stable home for Tiphani, it is clear from the record that he fails to comprehend what is necessary to provide for Tiphani and keep her safe. "A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re Arteria H.*, 326 S.W.3d at 177 (citations omitted). Although Father sincerely desires to maintain his relationship with Tiphani, there is little likelihood of such improvement as would allow the safe return of Tiphani in the near future. Accordingly, we affirm the finding of the trial court terminating Father's parental rights on the ground of persistence of conditions.

### ii. Substantial Noncompliance

We next address whether DCS clearly and convincingly proved the ground of substantial noncompliance. Tennessee Code Annotated section 36-1-113(g)(2) establishes a ground for termination if "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4." Tenn. Code Ann. § 36-1-113(g)(2) (2010). Termination for substantial noncompliance is warranted only when the plan's requirements are "'reasonable and related to remedying the conditions which necessitate foster care

placement.'" *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). The determination of whether noncompliance is substantial compares the degree of noncompliance with the importance of the unmet obligation. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citations omitted). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *Id.* at 656-57 (citations omitted).

The trial court found clear and convincing evidence established Mother and Father's substantial noncompliance with the requirements of the permanency plans. Father's substantial noncompliance included his failure to complete drug and alcohol after care treatment, refusal to take a drug test, failure to complete counseling, failure to make progress addressing issues related to his ability to safely parent Tiphani, and failure to establish a safe and suitable home for himself and Tiphani. Mother's substantial noncompliance included her failure to maintain a safe and suitable home for herself and Tiphani, and failure to stabilize her mental illness in order to appropriately parent Tiphani.

We begin by addressing the trial court's order following the permanency hearing in which it found that Mother and Father were in substantial compliance with the permanency plans. Mother and Father's arguments emphasize that this determination was less than two months before DCS filed its termination petition, and thus the trial court erred in finding substantial noncompliance. After the permanency hearing, the trial court found that Mother and Father made progress toward remedying the situation that existed at the time of Tiphani's removal. The trial court, however, expressed grave concerns about Mother and Father living together, did not believe Tiphani would be safe living with Mother and Father, and did not recommend reunification. While Mother and Father made commendable progress, the trial court's order made clear that reunification would not occur absent a change of circumstances ensuring Tiphani's safety.

Mother argues the trial court erred in focusing on her incarceration at the time of the termination hearing as substantial noncompliance with the permanency plan requirement that she be a law abiding citizen. Our review of the record indicates that this was not the crux of the trial court's finding. The trial court found substantial noncompliance based on Mother's failure to maintain a safe and stable home for Tiphani, and Mother's failure to maintain her mental health to appropriately parent Tiphani. Mother failed to offer any proof of her projected release date from incarceration, or that she would have a sufficiently safe and stable home for Tiphani upon her release from incarceration. Although DCS provided reasonable efforts to help Mother stabilize her mental health, Mother's incarceration only frustrated these efforts. Further, Mother admitted that she was not telling her psychiatrist she was still hearing voices because she feared she would not be reunited with Tiphani. The record clearly and convincingly shows that Mother failed to maintain her mental health and

-13-

provide a safe and suitable home for Tiphani. Therefore, we affirm the finding of the trial court terminating Mother's parental rights on the ground of substantial noncompliance.

Father argues the trial court erred in finding substantial noncompliance because the permanency plans did not require him to monitor or assist in maintaining Mother's mental health. The trial court, however, did not base its finding of substantial noncompliance on this obligation. The trial court found substantial noncompliance based on Father's failure to complete drug and alcohol after care treatment, refusal to take a drug test, failure to complete counseling, failure to make progress addressing issues related to his ability to safely parent Tiphani, and failure to establish a safe and suitable home for himself and Tiphani. While it is unclear from the record whether Father met all of these obligations under the permanency plan, it is clear that he did not maintain a safe and stable home for Tiphani. After Tiphani's removal in December 2008, Father admitted he lived with his brother for four months, his aunt for two months, with Mother in her apartment for six months, and again with his aunt for two months. Therefore, we must determine whether Father's failure to maintain a safe and suitable home constitutes "substantial" noncompliance. Our determination of whether noncompliance is substantial depends on the degree of noncompliance and the importance of the unmet obligation. *In re M.J.B.*, 140 S.W.3d at 656 (citations omitted). The overriding importance of a safe and stable home environment in which to raise a child is undeniable. Father's inability to maintain a safe and stable home in which to raise Tiphani amounts to substantial noncompliance. Thus, we affirm the finding of the trial court terminating Father's parental rights on the ground of substantial noncompliance.

## C. Best Interests

Finally, we must address whether termination of Mother and Father's parental rights was in Tiphani's best interests. Termination of parental rights is appropriate only if clear and convincing evidence establishes that eliminating those rights is in the best interests of the child or children named in the petition. Tenn. Code Ann. § 36–1–113(c)(2) (2010). Courts consider the following non-exhaustive list of factors when determining the best interests of a child:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or

-14-

other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36–5–101.

Tenn. Code Ann. § 36–1–113(i)(1)–(9) (2010). "Every factor need not be applicable in order for the trial court to determine that it is in the best interest of the child for a parent's right[s] to be terminated." *In re D.C.A.*, No. M2008–01279–COA–R3–PT, 2009 WL 837877, at *8 (Tenn. Ct. App. Mar. 30, 2009) (*no perm. app. filed*). The weight and relevance of these factors may vary from case to case and it is possible that a single factor is determinative. *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). In evaluating the issue of best interests, the court must remember that any conflict between the best interests of a child and the adult parent "shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36–1–101(d) (2010).

After reviewing the record, we find that Tiphani's best interests weigh heavily in favor of termination. Despite the efforts of DCS, Mother and Father failed to maintain a safe and stable home for Tiphani, and Mother failed to control her mental health such that a lasting adjustment of circumstances did not reasonably appear possible. Further, removing Tiphani from her foster mother and stable home environment would have serious negative effects on Tiphani's emotional condition. Tiphani has been in the custody of her foster mother since she was roughly three months old, and it would be devastating to remove her from the only stable environment she has ever known. While Mother and Father argue the trial court erred by not giving more weight to the fact that they maintained regular visitation, any conflict

between their interests and Tiphani's must be resolved in the best interests of the child.  On the other hand, the foster mother has developed a healthy, safe, and loving relationship with Tiphani.  While in the foster mother's custody, Tiphani has reached and exceeded all of her developmental milestones.  Moreover, the foster mother intends to adopt Tiphani at the conclusion of these proceedings.  We find that Tiphani's best interests strongly support termination of Mother and Father's parental rights.  Therefore, the decision of the trial court is affirmed.

## V.  Conclusion

For the foregoing reasons, we affirm the trial court's decision to terminate Mother and Father's parental rights on the grounds of persistence of conditions and substantial noncompliance.  Costs of this appeal are assessed to the appellant, Mercedes T.N., and appellant Terry N.H., for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE