IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned On Briefs May 4, 2012

IN RE: PAYTON A.D.L., (d.o.b. 02/26/2011), A Child Under Eighteen (18)
Years of Age

Direct Appeal from the Juvenile Court for Sevier County
No. 11-001231     Dwight E. Stokes, Judge

No. E2012-00090-COA-R3-PT-FILED-JUNE 20, 2012

This is a termination of parental rights case.  Mother argues that the evidence presented to the trial court did not clearly and convincingly establish that termination of her parental rights was in the best interests of the child.  After thoroughly reviewing the record, we affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed
and Remanded

DAVID R. FARMER, J., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Rolfe A. Straussfogel, Sevierville, Tennessee, for the appellant, Tiffany E. P.

Robert L. Huddleston, Maryville, Tennessee, Guardian *ad Litem* for the appellee, Payton A.D.L.

Robert E. Cooper, Jr., Attorney General and Reporter and Joshua Davis Baker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

OPINION

I.  Background and Procedural History

On February 26, 2011, Payton A.D.L. ("Payton") was born to Tiffany E. P. ("Mother") and Ricky D. L. ("Father").  Shortly thereafter, the Department of Children's Services ("DCS") received a referral that Mother exposed Payton to narcotics while she was pregnant. DCS confirmed these allegations after drug tests indicated that both Mother and Payton tested positive for Oxycodone.  On March 2, 2011, Rebecca Garrison ("Ms. Garrison"), a

Child Protective Services investigator, met with Mother and Father regarding the allegations of drug use, and they both admitted to taking Oxycodone orally, nasally, and intravenously for several years. When Ms. Garrison inquired about the last time either parent used drugs, both Mother and Father admitted that they used drugs the previous day.

As a result of Mother's drug use while pregnant, Payton was born prematurely with an opiate addiction. Because Payton suffered from withdrawal, he was transferred to the neonatal intensive care unit for treatment. Payton developed GERD, a form of acid reflux, which makes him more susceptible to pneumonia, and for which he must take two forms of medication. Payton also has a developmental delay and a reactive airway disease which requires him to undergo two breathing treatments each day. Furthermore, Payton goes to an allergist and has been recommended for physical therapy.

On March 10, 2011, Payton was removed into the custody of DCS. On March 14, 2011, DCS filed a petition for temporary legal custody. DCS argued that Mother severely abused Payton by exposing him to drugs while she was pregnant, and requested that Payton be adjudicated dependent and neglected. On March 15, 2011, the juvenile court issued a protective order placing Payton in DCS's custody. Thereafter, the juvenile court entered an order appointing a guardian ad litem. On March 23, 2011, counsel was appointed for Mother and Father, and they both waived the requirement of a preliminary hearing after stipulating that probable cause existed to sustain the removal of Payton from their custody.

On April 5, 2011, DCS developed the first set of permanency plans for Payton with goals of exiting custody to live with a relative or return to his parents. The plan requirements for Mother centered around her history of drug abuse and addiction. The plan required Mother to: (1) submit to an alcohol and drug assessment and follow all recommendations, including aftercare; (2) resolve all legal issues and incur no additional legal criminal charges; (3) submit to and pass random drug screens before visitations, and bring any legally prescribed medications to the drug screen appointments for verification purposes; (4) attend Payton's medical appointments upon completion of three negative drug screens; (5) submit to a mental health intake evaluation and follow recommendations; (6) attend parenting classes and demonstrate skills learned during visitation; (7) secure and maintain a legal source of income and provide documentation to DCS; (8) secure and maintain access to adequate transportation; and (9) secure and maintain appropriate housing, which DCS will evaluate for safety prior to return of custody. Although Mother did not attend the Child and Family Team Meeting to develop the permanency plan, a copy of the plan was mailed to her and she acknowledged receiving a copy of the plan, reading it, and reviewing it with Carol Davis ("Ms. Davis"), a DCS Family Service Worker. Moreover, the record indicates that the juvenile court explained the termination criteria to Mother.

On June 29, 2011, the juvenile court conducted an adjudicatory hearing. Although Mother was notified of the hearing, she failed to attend because she was then receiving treatment at a methadone clinic for her Oxycodone addiction. At the conclusion of the hearing, the juvenile court found that Mother severely abused Payton by exposing him to drugs while she was pregnant, and ruled that Payton was dependent and neglected. The juvenile court based its ruling on the deposition of Dr. Miriam Webster, an expert in pediatric rehabilitation of drug exposed infants, who testified that Mother's drug abuse while pregnant would likely result in Payton's death or severe developmental delay. The juvenile court also ratified the permanency plan as being reasonably related to remedying the conditions that necessitated Payton's removal. Furthermore, based on its finding of severe abuse, the juvenile court relieved DCS of its duty to make reasonable efforts.[1]

On July 29, 2011, the guardian ad litem filed a petition to terminate the parental rights of Mother and Father. As grounds for termination, the petition alleged abandonment for failure to visit, abandonment for failure to support, abandonment for failure to provide a suitable home, substantial noncompliance with the requirements of the permanency plan, and severe child abuse. The petition further provided that termination of Mother and Father's parental rights was in the best interests of Payton.

On December 19, 2011, the juvenile court conducted a hearing on the petition to terminate Mother and Father's parental rights. Both Mother and Father arrived more than one hour late to the hearing. Shortly after their arrival, however, Father agreed to voluntarily surrender his parental rights. As a result, the focus of the hearing was only on the termination of Mother's parental rights. The juvenile court heard testimony from Ms. Garrison, Mother, Ms. Davis, the former foster mother, and the current foster mother. The juvenile court also considered exhibits introduced by the guardian ad litem which included certified copies of the pleadings, permanency plans, and affidavits of reasonable efforts.

Ms. Garrison testified about her assignment to the case and her investigation after DCS received the referral that Payton was a drug exposed infant. Ms. Garrison described her meeting with Mother on March 2, 2011, in which Mother admitted to using drugs not only while pregnant, but also after she gave birth to Payton. Ms. Garrison further stated that after she confirmed the allegations that Mother had exposed Payton to drugs while pregnant, she filed the petition for temporary legal custody on behalf of DCS, and thereafter she was no longer involved in the case.

Mother admitted that she had struggled with an addiction to opiate pain medication

---

[1]Although the juvenile court relieved DCS of its duty to make reasonable efforts, DCS remained in contact with Mother in order to notify her of scheduled parenting plan and child and family team meetings.

since the age of nineteen. She stated that she used drugs nasally and intravenously throughout her pregnancy, and admitted that she understood the risks that her drug use posed to Payton's health and development. Mother admitted that she did not visit Payton during the time before the guardian ad litem filed the petition to terminate her parental rights because she could not pass a drug screen. Mother, however, did visit seven times after the termination petition was filed, and passed a drug screen before each visitation. Furthermore, Mother acknowledged that she only attended one of Payton's doctor's appointments, and that she arrived late to that appointment because she chose to stop by the methadone clinic first.

At the time of the termination hearing, Mother was seventeen weeks pregnant with another child. She admitted, however, that she continues to use methadone while pregnant, well aware of the risks that drug use poses to her unborn child.[2] Mother further testified that, as of the trial date, she was unemployed, had no legal source of income, and relies on her grandmother to support her. Moreover, Mother never met in person and failed to communicate with her court appointed counsel to prepare for the termination hearing.

Ms. Davis discussed Mother's failure to meet the permanency plan requirements. Ms. Davis testified that Mother failed to submit to a mental health intake evaluation, did not provide proof of completion of parenting classes, did not submit to random drug screens, and did not complete alcohol and drug assessment. Ms. Davis further explained that Mother's failure to attend scheduled drug screens is considered by DCS as a positive drug screen. Ms. Davis testified that, in November 2011, she visited Mother at her grandmother's house where she lived. Upon investigation of the house, Ms. Davis stated that it was not what DCS would consider a safe and appropriate home because it did not have running water, did not have a stove, and lacked complete flooring. Ms. Davis also testified that, during a Child and Family Team Meeting, Mother stated that "[i]f you won't give me Payton back then I'll just have another baby to replace him." Furthermore, Ms. Davis explained that Payton currently lives with a foster family that loves him and cares for all of his medical issues, which includes taking him to approximately sixteen doctor's appointments each month to address his rehabilitation needs.

Christy Parton ("Ms. Parton") testified that she has served as Payton's foster mother since September 15, 2011. Even before that time, Ms. Parton stated that she has visited with Payton since he was less than one month old. Although Payton requires daily breathing treatments, allergy medication, acid reflux medication, and multiple antibiotics for various sicknesses, Ms. Parton testified that her family loves him, has formed a strong bond with him, and plans to adopt him. Additionally, Donna Stern ("Ms. Stern"), testified that she

---

[2]Despite Mother's efforts to overcome her struggle with drug addiction, she has been unable to complete the first of four phases of the treatment process since she began methadone treatment in June 2011.

served as Payton's foster mother from the time he came into DCS custody in March 2011 until Ms. Parton began caring for him. Ms. Stern stated that Mother never attempted to contact or visit Payton during the time she served as his foster mother. Ms. Stern also discussed Mother's failure to attend Payton's doctor's appointments.

At the conclusion of the hearing, the trial court issued an oral ruling that grounds existed to terminate Mother's parental rights, and that termination was in the best interests of Payton. On January 12, 2012, the juvenile court entered its final order terminating Mother's parental rights. The juvenile court concluded that the evidence presented clearly and convincingly established all five grounds for termination, and clearly and convincingly established that termination of Mother's parental rights was in the best interests of Payton. Thereafter, Mother timely filed a notice of appeal to this Court.

## II. Issue Presented and Standard of Review

On appeal, Mother does not challenge the trial court's finding of grounds for termination of her parental rights.[3] Instead, Mother argues that the evidence presented to the trial court did not clearly and convincingly establish that termination of her parental rights was in the best interests of Payton.

We review a trial court's findings of fact *de novo* upon the record, according a presumption of correctness to the findings unless a preponderance of the evidence is to the contrary. Tenn. R. App. P. 13(d); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citation omitted). No presumption of correctness attaches to a trial court's conclusions of law. Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn.2000) (citation omitted). We will not reevaluate the determinations of a trial court based on an assessment of credibility unless clear and convincing evidence is to the contrary. *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005) (citation omitted). Furthermore, where the trial court has not made a specific finding of fact, we review the record *de novo. In re Valentine*, 79 S.W.3d at 546 (citation omitted).

Tennessee Code Annotated section 36–1–113 governs the termination of parental rights. This provision of the Code provides, in pertinent part:

---

[3]Mother concedes that clear and convincing evidence existed to establish the ground of severe child abuse based on her drug use while pregnant. Tenn. Code Ann. § 36-1-113(g)(4) (2010). As a result, this appeal only involves the trial court's best interests determination because only one ground for termination of parental rights need be established to uphold a trial court's decision. *State, Dep't. of Children's Servs. v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008) (citing *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004)).

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36–1–113(c)(1), (2) (2010). This two-step analysis requires appellate courts to consider "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). "Although the 'clear and convincing evidence' standard is more exacting than the 'preponderance of the evidence' standard, it does not require the certainty demanded by the 'beyond a reasonable doubt' standard." *In re M.A.B.*, No. W2007–00453–COA–R3–PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007) (citation omitted). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *Id.* (citation omitted).

The heightened burden of proof in parental termination cases requires us to distinguish between the trial court's findings with respect to specific facts and the "combined weight of these facts." *In Re: Michael C. M.*, No. W2010–01511–COA–R3–PT, 2010 WL 4366070, at *2 (Tenn. Ct. App. Nov. 5, 2010) (quoting *In Re: M.J.B* ., 140 S.W.3d 643, 654 n.35 (Tenn. Ct. App. 2004)). Although we presume the trial court's specific findings of fact to be correct if they are supported by a preponderance of the evidence, we "must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion." *Id.*

## III. Analysis

Termination of parental rights is appropriate only if clear and convincing evidence establishes that eliminating those rights is in the best interests of the child or children named in the petition. Tenn. Code Ann. § 36–1–113(c)(2). Courts consider the following non-exhaustive list of factors when determining the best interests of a child:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear

possible;

（3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

（4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

（5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

（6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

（7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

（8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

（9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36–5–101.

Tenn. Code Ann. § 36–1–113(i)(1)–(9). "Every factor need not be applicable in order for the trial court to determine that it is in the best interest of the child for a parent's right[s] to be terminated." *In re D.C.A.*, No. M2008–01279–COA–R3–PT, 2009 WL 837877, at *8 (Tenn. Ct. App. Mar. 30, 2009) (*no perm. app. filed*). The weight and relevance of these factors may vary from case to case and it is possible that a single factor is determinative. *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). In evaluating the issue of best interests, the court must remember that any conflict between the best interests of a child and the adult parent "shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36–1–101(d).

In its final order terminating Mother's parental rights, the trial court stated:

The Court is aware of the crucial nature of these cases; there is not really anything more important than this type of case. The case begins with tragic facts: the child was born into a very difficult life due to no fault of his own. He was born with developmental issues, physical issues. No one can know exactly what this child has gone through or what Herculean efforts have

-7-

had to be made by some people as a result of that. This child's situation required treatment, multiple doctor's treatments, and rehabilitation.

This situation presents a tragedy for the mother. The mother suffers from a crippling addiction. Due to her addiction, she neglects and abuses her own health. Due to her addiction, she neglects and abuses her unborn child's health leading to serious problems after his birth. From all of the testimony which has been introduced and from previous orders, introduced as exhibits, the Court notes that the mother's horrible addiction which was visited upon the child could have resulted in the death or a crippling problem for the child.

. . . .

Her life has been impacted by her horrible addiction, personal choices that she has made, people that she has chosen to be around, her friends, her associates, her decision to use illegal drugs, her decision to continue to feed this addiction even after she became pregnant. People are generally on notice today of the harmful effects that drugs and drug use can have, particularly on a pregnancy. As to all that she was aware of or known, I can't say, but there are choices to be made and there's much information out today about that. But those choices result in her child having been born under very dangerous and harmful circumstances.

. . . .

While this mother was faced with extreme problems and the situation of her child entering DCS custody, the mother needed to make great efforts to resolve her problems. She needed to make great efforts to the extent she can or make reasonable efforts at a minimal [sic].

The child's life will go on. In other words, at the point in time when this child entered DCS custody, he had incredible needs that had to be met. Because of the mother's choices, doctors, caretakers, nurses, specialists, foster parents, and workers for the State are called upon to address the child's needs. Those parties had to make an incredible commitment to this child. Those efforts have to be made by those who are willing to step in and make them. And the clock continues to run for the child.

How does the mother respond to this great challenge? For a time, she elects to feed her addiction, for many months. She continues to use drugs

which are expensive and pronounced for several months. Part of this is a natural consequence of her addiction. During this time she also continued to associate with people, at great expense, and goes, as she described it "from pill to pill, the next pill," and that is difficult. Although her child had been taken away, and although he had been born drug exposed, and now that she should have reasonably put aside her drug use, for the benefit of the child, she failed to appear for Court (the adjudicatory hearing). She did not attend doctors appointments and significant caretaker events, all kinds of key events to show up for; one, to learn about what it takes to address these issues with her child. She indicated a lack of understanding in her own testimony. She might have been able to address that lack of understanding by attending some of these appointments. She attended one.

The mother failed to visit for over four months. She failed to provide any support although she expended large sums for her drug addiction, lying and basically stealing from others. The mother failed to follow through on the permanency plan requirements. She did not make good efforts.

. . . .

But in the wake of this horrible tragedy surrounding the birth of her child, the mother failed to make the Herculean efforts that one would likely make – or even to make reasonable efforts to address her issues and those of her child.

For today's court date, the mother was significantly late. A very important day arguably from her own testimony and from what all of us can see what is happening on this day. A decision is being made that impacts a bunch of lives, in particular, her and her child's life and other caretakers. Arguably the most important day of her life and she showed up late.

. . . .

A parent is not entitled to just put a child's life on hold or put it on pause like you would with a DVD or something. A child's life is not put on hold. Other people in this courtroom have worked very hard for this child. These foster parents, the mother testified, have made an incredible commitment of time and effort. They have an incredible commitment of love, of affection and devotion to this child. Their commitment is really somewhat unbelievable for most people to be able to see. Where there are no guarantees,

these people step up and have enough love and are willing to sacrifice and have their family go through sacrifices to make this extraordinary effort. Time was of the essence when this child came into the world and these people have been able to step up for this child's benefit.

. . . .

The Court finds that the facts and circumstances in this case warrant a finding of best interest and does make that finding by clear and convincing evidence. Despite efforts being made by the State on her behalf, the mother has not made efforts to resolve her circumstances. The Court emphasizes the mother's failure to attend appointments, the failure to be a part of the child's life, to learn what is going on. It will be many more months, probably years, before the mother is anywhere close to being in a position to be a custodian for this child. The child appears to be thriving in his environment in his current placement. The mother has not provided support for the child. The mother has abused and neglected this child due to the *in utero* drug exposure to which she subjected him. By clear and convincing evidence, and pursuant to [Tennessee Code Annotated section] 36-1-113(i), the Court finds that it is in the best interest of the child[] to terminate [Mother's] parental rights.

From our thorough review of the record, giving due deference to the trial court's credibility determinations, we conclude that the evidence presented clearly and convincingly established that terminating Mother's parental rights was in Payton's best interests. Mother has not made such an adjustment of her circumstances that would warrant Payton's return to her custody. Mother failed to appear for a scheduled drug screen just days before the termination hearing, which DCS considers a positive drug screen, and she continues to use drugs while pregnant with her current child. Mother has no legal source of income or appropriate housing in which to raise Payton. Mother did not provide any support for Payton. Moreover, Mother failed to establish a relationship or maintain regular visitation with Payton. In fact, Mother admitted that she has only seen Payton a handful of times since his birth, those instances occurring only after the guardian ad litem filed the petition to terminate her parental rights.

We are mindful of Mother's attempts to overcome her lengthy struggle with drug addiction. At this point, however, our focus is on Payton's best interests, not Mother's. It is undisputed that Mother used drugs while pregnant, that Payton was born drug addicted, and that Payton suffered from withdrawal symptoms after birth. It is also undisputed that Payton is currently dealing with, and will continue to deal with, the long-term effects that Mother's prenatal drug use has had on his health and development. Unfortunately, Mother

-10-

chose to continue using drugs instead of taking the necessary steps needed to regain custody of her child. On the other hand, Ms. Parton, the foster mother, and her family have provided a safe, loving, and caring environment for Payton. Despite all of Payton's special needs, Ms. Parton and her family have accepted the responsibilities involved in caring for him, have formed a strong bond with him, and plan to adopt him at the conclusion of these proceedings. Accordingly, we conclude that Payton's best interests strongly support termination of Mother's parental rights.

## IV. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court. Costs of this appeal are taxed to the Appellant, Tiffany E. P., and her surety, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE